Yeary, J., delivered the opinion of the Court in which Johnson, Keasler, Alcala, Richardson, and Newell, JJ., joined.
In July 2013, a jury convicted appellant of capital murder for the March 28, 2011 murders of Keenan Hubert and Tyus Sneed during the same criminal transaction. See TEX. PENAL CODE § 19.03(a)(7)(A). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 3(h). Appellant raises eleven points of error.[2] After reviewing *838 appellant's points of error, we find appellant's sixth point of error, regarding the warrantless seizure of his text messages, to have merit. Consequently, we reverse the trial court's judgment and sentence of death.
BACKGROUND
The evidence at trial showed that on April 8, 2010, Emuel Bowers III was shot and killed while sitting in his car at a Waco park. Close friends and associates of Bowers concluded that Keenan Hubert, a.k.a. "Lockie," was responsible for Bowers' death even though the police had uncovered no evidence to support this theory. These friends included appellant, Rickey Cummings ("Rickey"), and Rickey's brother D'Arvis ("D'Arvis") Cummings. Appellant and the Cummings brothers had grown up with Bowers, who was also known by the nicknames "T-Bucks" and "Man-Man." This group was also close to Bowers' mother, Shelia Bowers, whom appellant referred to as "Mama Shelia" or "Aunt Shelia."
As the first anniversary of the shooting approached, no charges had been filed against any suspect. Appellant, his friends, and Bowers' family were frustrated by that. They felt that they had identified a good suspect, and they had provided that information to the authorities.
On the evening of March 28, 2011, Hubert, Marion Bible, and Deontrae Majors were in Majors' car, which was parked at the Lakewood Villas Apartments in east Waco. Rickey walked by and glared at Hubert, who then "rapped" some antagonizing lyrics at Rickey. After Rickey walked away, Tyus Sneed arrived and joined Hubert, Bible, and Majors in the car to watch videos and smoke marijuana.
At approximately 11:20 p.m., Majors' car was hit with a hail of bullets, shattering all of its windows except the front windshield. Sneed and Hubert were each shot eight times and died in the back seat of Majors' parked car. Majors and Bible, although wounded, were able to escape through the front passenger door. Immediately thereafter, an eyewitness saw Rickey chase Bible and Majors and then abandon his pursuit when his .45-caliber gun jammed.
The evidence showed that the attackers most likely used an AK-47, along with weapons that fired .38-, .40-, and .45-caliber ammunition. Around the time of the offense, three men had been seen in the complex, including a heavy-set man carrying a "long gun." Appellant was described as heavy-set in 2011, according to testimony given at trial. Further, evidence showed that appellant had been attempting to purchase an AK-47 in the weeks prior to the murders. The State argued at trial that Hubert's murder was a revenge killing and that Sneed died because he was in the wrong place at the wrong time.
In appellant's sixth point of error, he argues that the trial court erred in admitting cellular (cell) phone records in violation of the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, sections 9, 10, and 19 of the Texas Constitution. Appellant filed a general pretrial motion to suppress records obtained in violation of the law, and a motion specifically to suppress all cell phone records because they were seized without a search warrant supported by probable cause.[3]
*839 During the testimony of Kenneth LeCesne, who was the Metro PCS Telephone Company custodian of records and a 28-year veteran of the Dallas Police Department, the State sought to introduce appellant's cell phone records, labeled as State's Exhibit 184 (which included 37 pages showing the contents of approximately 1,600 text messages) and State's Exhibit 185 (call logs from a second number registered to appellant). A hearing on the admissibility of the exhibits was held outside the jury's presence. Appellant specifically objected that the records were inadmissible because they were obtained without a search warrant.[4] The State responded that *840 the records had been properly obtained through a "court order," although this order was not provided during the hearing.[5] The trial court overruled appellant's objection and admitted the records.
On appeal, appellant complains that his cell phone records (including subscriber information, call logs, location information, and text messages) were obtained as a result of a warrantless search and seizure in violation of federal and state constitutional prohibitions against unlawful searches and seizures. He further asserts that the records were obtained "by subpoena," which violated the Stored Communications Act. See 18 U.S.C. § 2703(d). The State argues that, contrary to appellant's assertion, appellant's records were legally obtained via a valid court order compelling the production of appellant's cell phone records pursuant to Title 18, § 2703(d) of the United States Code and Article 18.21, § 5(a).[6]
STANDARD OF REVIEW
"In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review." Wilson v. State , 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010). "Although we give almost total deference to the trial court's determination of historical facts, we conduct a de novo review of the trial court's application of the law to those facts." Id. at 458. Here, the facts of the search and seizure are not in dispute as the records were obtained via a court order. The issue before us is whether the court order was the appropriate vehicle for obtaining the records. Resolving this issue involves construing the scope of Fourth Amendment protections in this context. Therefore, the question is solely a matter of law, for which review is de novo . Id.
ANALYSIS
Fourth Amendment
The Fourth Amendment "protects people, not places." Katz v. United States , 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public [such as the public phone booth at issue in Katz itself], may be constitutionally protected." Id. at 351-52, 88 S.Ct. 507. Whether a person's Fourth Amendment rights have been compromised depends, under this regime, on the answer to "two discrete questions." Smith v. Maryland , 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). First, has the person, by his conduct, exhibited an actual (subjective) expectation of privacy-did he seek to preserve something as private? Id. And secondly, if so, is that subjective expectation one that society is prepared to recognize as reasonable or justifiable under the circumstances? Id. at 740-41, 99 S.Ct. 2577. The question in this case is whether appellant had an expectation of privacy in his service provider's records of his cell phone use, and whether society would regard that expectation as *841 reasonable or justifiable under the circumstances.
Appellant's cell phone records, including call logs, historical cell site location information (CSLI), and text messages, were held by Metro PCS, an internet service provider (ISP), on the Metro PCS company servers. Traditionally, individuals do not maintain a reasonable expectation of privacy in information voluntarily revealed to third parties. See, e.g., United States v. Miller , 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) ; Smith v. Maryland , 442 U.S. at 743-45, 99 S.Ct. 2577. Specifically, the United States Supreme Court has held that individuals do not have a privacy right in the numbers dialed on their phones. Smith , 442 U.S. at 744-45, 99 S.Ct. 2577. The Supreme Court noted that "[t]elephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." Id. at 743, 99 S.Ct. 2577. By similar reasoning, most courts that have addressed the question, including this Court, have held that CSLI information obtained from the records of a service provider is not protected under the Fourth Amendment. Ford v. State , 477 S.W.3d 321, 329-30 & nn. 5-7 (Tex. Crim. App. 2015). Appellant's call logs and CSLI are not, therefore, constitutionally protected.
Even in Smith , however, the Supreme Court drew a distinction between the numbers dialed and the content of the communications, observing that "[a]lthough [Smith's] conduct may have been calculated to keep the contents of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed." Id. (emphasis added). Similarly, in holding that CSLI records may be obtained through a court order supported by less than probable cause, we reasoned that "this type of non-content evidence, lawfully created by the cell-phone companies themselves and ... subject to their control, does not belong to [a defendant] even if it concerns him." Ford v. State , 477 S.W.3d at 321 (emphasis added) (citing United States v. Davis , 785 F.3d 498, 511 (11th Cir. 2015) (en banc)); see also In re Application of the United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't , 620 F.3d 304, 313 (3rd Cir. 2010) (stating that CSLI "is obtainable under a § 2703(d) order and does not require the traditional probable cause determination"); In re Application of the United States for Historical Cell Site Data , 724 F.3d 600, 615 (5th Cir. 2013) (" In re Application (Fifth Circuit) ") (concluding that the government can use Stored Communications Act orders to obtain CSLI without implicating the Fourth Amendment).
Records containing personal content, on the other hand, seem to require more protection. To begin with, courts have clearly held that the government must first obtain a search warrant before it may search the contents of a person's cell phone that has been taken from the person of a defendant. See State v. Granville , 423 S.W.3d 399, 417 (Tex. Crim. App. 2014) (concluding that a defendant's reasonable expectation of privacy in the contents of his cell phone was not lost merely because the phone was taken from him incident to an arrest and stored in the jail property room); see also Riley v. California , --- U.S. ----, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014) (holding that authorities must obtain a search warrant before searching the digital contents of a cell phone; the digital contents were not subject to the "search incident to arrest" exception). But what about the contents of a text message that *842 has been transmitted via a cell phone to a service provider and remains stored in its server? Has the content of that communication been voluntarily disclosed to a third party such that the sender may no longer claim to have-or at least may reasonably claim to have-an expectation of privacy in it?
Many courts have treated text messages as analogous to the content of an envelope conveyed through the United States mail. In that context, the United States Supreme Court long ago held:
Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household.
Ex parte Jackson , 96 U.S. 727, 733, 24 L.Ed. 877 (1877). See also United States v. Jacobsen , 466 U.S. 109, 114, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable.").
Relying on this analogy, the Sixth Circuit has expressly held that turning over the content of an email to a service provider does not extinguish a reasonable expectation of privacy any more than "trusting a letter to an intermediary" in the form of the mail system. United States v. Warshak , 631 F.3d 266, 285 (6th Cir. 2010). In holding that the content of an email, even when stored by a service provider, retains its Fourth Amendment protection, the Sixth Circuit reasoned:
If we accept that an email is analogous to a letter or a phone call, it is manifest that agents of the government cannot compel a commercial [Internet Service Provider] to turn over the contents of an email without triggering the Fourth Amendment. An [Internet Service Provider] is the intermediary that makes email communication possible. Emails must pass through an [Internet Service Provider's] servers to reach their intended recipient. Thus, the [Internet Service Provider] is the functional equivalent of a post officer or a telephone company. As we have discussed above, the police may not storm the post office and intercept a letter, and they are likewise forbidden from using the phone system to make a clandestine recording of a telephone call-unless they get a warrant, that is. It only stands to reason that, if government agents compel an [Internet Service Provider] to surrender the contents of a subscriber's emails, those agents have thereby conducted a Fourth Amendment search, which necessitates compliance with the warrant requirement absent some exception.
Id. at 286 (citations omitted); see also United States v. Carpenter , 819 F.3d 880, 887 (6th Cir. 2016) ("The Fourth Amendment protects the content of the modern-day letter, the email."). At least one state intermediate appellate court has found this analogy persuasive and applicable to text messages as readily as to emails. State v. Clampitt , 364 S.W.3d 605, 611 (Mo. Ct. App. 2012) ("The rationale used by the Warshak court in establishing individuals' reasonable expectation of privacy in the *843 contents of their email is equally applicable to cell phone users' expectations of privacy in the contents of their test messages."). Other courts have similarly concluded that a cell phone user has a reasonable expectation of privacy in the content of his text messages, even when they are conveyed to and stored by his service provider. See State v. Bone , 107 So.3d 49, 66 (La. App. 2012) (defendant had a reasonable expectation of privacy in the content of his text messages obtained from his cell phone company); Quon v. Arch Wireless Operating Co. , 529 F.3d 892,905 (9th Cir. 2008), rev'd on other grounds sub nom. City of Ontario, California v. Quon , 560 U.S. 746, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010) (cell phone "users do have a reasonable expectation of privacy vis-a-vis the service provider").
Admittedly, the analogy is not a perfect one. There is a difference between emails and text messages, on the one hand, and letters and telephone calls on the other. A letter remains in its sealed envelope until it arrives at its destination, and the telephone company does not routinely record private telephone conversations. But internet and cell phone service providers do routinely store the content of emails and text messages, even if they do not necessarily take the time to read them. Why should the third-party doctrine of Smith and Miller not apply? Has the sender of the text message not voluntarily disclosed that content, knowing it will be stored in a server somewhere and subject to potential scrutiny by a third-party interloper? Can he really maintain a reasonable expectation for privacy under these circumstances?
We think the answer is yes, he still can. Regarding records of content-based communication held by a third party, such as emails or text messages stored by a service provider, courts have determined whether a reasonable expectation of privacy survived the disclosure based upon whether the information was voluntarily disclosed to the third party for a specific business-related purpose, such as routing information, or merely transmitted using the services of the third party service provider. For example, the Fifth Circuit has distinguished the incidental records of the "content" of communications between two independent parties from necessary business records that document the transactions between the customer and the third-party service:
Defining business records as records of transactions to which the record-keeper is a party also fits well with the historical and statutory distinction between communications content and addressing information. See United States v. Forrester , 512 F.3d 500, 511 (9th Cir. 2008) ("In a line of cases dating back to the nineteenth century, the Supreme Court has held that the government cannot engage in a warrantless search of the contents of sealed mail, but can observe whatever information people put on the outside of mail, because that information is voluntarily transmitted to third parties.") (collecting cases); see, e.g. , 18 U.S.C. § 2703(b) - (c). Communications content, such as the contents of letters, phone calls, and emails, which are not directed to a business, but simply sent via that business, are generally protected. However, addressing information, which the business needs to route those communications appropriately and efficiently, are not. See Smith , 442 U.S. at 741, 99 S.Ct. 2577 (finding significant that pen registers, unlike the listening device employed in Katz , "do not acquire the contents of communications" and do not require a warrant); Forrester , 512 F.3d at 511 ("The government's surveillance of e-mail addresses also may be technologically sophisticated, but it is *844 conceptually indistinguishable from government surveillance of physical mail. ... E-mail, like physical mail, has an outside address 'visible' to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient.").
In re Application (Fifth Circuit) , 724 F.3d at 611.
Another legal commentator has observed similarly:
The significant factor distinguishing the business record cases [such as Miller and Smith ] ... is that, unlike stored text messages, each of the documents at issue in the business record cases was of independent interest to the business that received the documents from the individual. * * * [T]he bank in Miller had an independent interest in viewing the contents of the defendant's checks and deposit slips in order to complete the transactions. Moreover, the phone company in Smith required the defendant's dialed numbers to connect his phone calls and properly bill him. None of these cases involved the contents of personal communications. Rather, defendants conveyed information so that the recipient would do something with that information .... The substance of the information at issue was not only relevant to the recipient, it was essential for the recipient to conduct the transactions in question.
Conversely, a wireless service provider does not have any independent interest in the contents of the text messages its users send, nor are the contents required to complete the service or transaction. Because the contents of text messages are not of independent interest to the provider (i.e. , the contents themselves are not critical to transmitting the message), they are more analogous to the phone conversations at issue in Katz than the financial records and numbers dialed at issue in the business records cases and should be protected accordingly.
Alyssa H. DaCunha, Casenote: Txts R Safe 4 2day : Quon v. Arch Wireless and the Fourth Amendment Applied to Text Messages , 17 GEO. MASON L. REV. 295, 326-27 (Fall 2009).
And indeed, empirical data seem to support the proposition that society recognizes the propriety of assigning Fourth Amendment protection to the content of text messages: "Over 90%" of respondents to a recent survey reported that they "felt that law enforcement should never have access, or at least require a level commensurate with probable cause to obtain access to text, multimedia, or voicemail messages on cell phones." Christine S. Scott-Hayward, Henry F. Fradella & Ryan G. Fischer, Does Privacy Require Secrecy? Societal Expectation of Privacy in the Digital Age , 43 AM. J. CRIM. L. 19, 55 (Fall 2015).
All of this leads us to conclude that the content of appellant's text messages could not be obtained without a probable cause-based warrant. Text messages are analogous to regular mail and email communications. Like regular mail and email, a text message has an "outside address 'visible' to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient." See United States v. Forrester , 512 F.3d at 511. Further, the State presented no evidence that Metro PCS had any business purpose for keeping records of the contents of its customers' text messages.[7]
*845 Therefore, we hold that appellant had a reasonable expectation of privacy in the contents of the text messages he sent. See In re Application (Fifth Circuit) , 724 F.3d at 611 ; Warshak , 631 F.3d at 288. Consequently, the State was prohibited from compelling Metro PCS to turn over appellant's content-based communications without first obtaining a warrant supported by probable cause. See In re Application (Fifth Circuit) , 724 at 611 ; Warshak , 631 F.3d at 288.
The Exclusionary Rule
Were Appellant relying solely on the federal exclusionary rule, it would next be incumbent on us to decide whether the State obtained Appellant's text messages in objective good faith reliance upon the Stored Communications Act, the provisions of which permit law enforcement to obtain certain records from service providers upon receipt of a court order predicated on a showing of less than probable cause. See Illinois v. Krull , 480 U.S. 340, 349-50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (courts may not apply the Fourth Amendment exclusionary rule to suppress evidence obtained by an officer's asserted good faith reliance on a statute unless the statute is clearly unconstitutional); Warshak , 631 F.3d at 288-92 (emails that the Government received from the records of the defendant's internet service provider under the Stored Communications Act, because secured without a warrant based on probable cause, were obtained in violation of the Fourth Amendment, but suppression of those emails was not compelled because the Government relied in good faith on the statute and the statute was not "so conspicuously unconstitutional as to preclude good-faith reliance").
But appellant does not rely exclusively on the federal exclusionary rule. He also invokes the statutory exclusionary rule embodied in Article 38.23(a), which provides that no evidence obtained in violation of the United States Constitution "shall be admitted in evidence against the accused on the trial of a criminal case." And while Article 38.23(b) also codifies a good faith exception to the statutory exclusionary rule, this statutory good faith exception is "somewhat narrower" than the federal exception to the federal exclusionary rule, and it "makes no provision for evidence obtained in reliance upon a statute later held invalid, for example[.]" George E. Dix & John M. Schmolesky, 40 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 7:61, at 389 (3d ed. 2011). Instead, under Article 38.23(b), the good faith exception to the statutory exclusionary remedy applies only when the law enforcement officer acted "in objective good faith reliance upon a warrant issued by a neutral magistrate based upon probable cause." Here, because there was no warrant and no showing of probable cause, the statutory good faith exception is not triggered, and the general statutory exclusionary remedy applies.[8] The *846 trial court erred in failing to suppress the content of Appellant's text messages.
Harm Analysis
When the error in question is constitutional, an appellate court must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). In applying the "harmless error" test, we ask whether there is a "reasonable possibility" that the error might have contributed to the conviction. Mosley v. State , 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). Our analysis should not focus on the propriety of the trial's outcome; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. Wesbrook v. State , 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We consider such things as the nature of the error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. See Snowden v. State , 353 S.W.3d 815, 821-22 (Tex. Crim. App. 2011). This, however, is not an exclusive list of considerations. Instead, we take into account any and every circumstance apparent in the record that logically informs a determination whether, beyond a reasonable doubt, this particular error contributed to the conviction or punishment. Snowden , 353 S.W.3d at 822. This requires us to evaluate the entire record in a neutral manner and not "in the light most favorable to the prosecution." Harris v. State , 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (discussing constitutional harm under former TEX. R. APP. P. 81(b)(2)).
In assessing whether there is a "reasonable possibility" that the improperly admitted text messages may have contributed to appellant's conviction, we first set out a small sample of the approximately 1,600 text messages admitted at trial through appellant's cell phone records contained in State's Exhibit 184. This sample includes only some of the messages most emphasized by the State.
At 8:47 p.m. on March 28, 2011, less than four hours before the murders, appellant exchanged text messages with an unidentified person whose phone number ended in 4989. The State argued this message was from appellant's wife, Takelia Love ("Takelia")[9] and that it demonstrated that appellant was with Rickey and D'Arvis shortly before the offense:
3/28/2011 20:47:24 4989: So who u with -Luv my son (recoe)fr33 my son 3/28/2011 20:51:06 Appellant: Gang5ta rick and d[10]
[Editor's Note: The preceding image contains the reference for footnote[10] ]
One of the first texts appellant sent after the instant crime was this message to Bowers' mother, Shelia, who was angry that the police were not investigating Hubert for her son's murder:
*847 3/29/2011 01:55:43 Appellant: We love u mama 3/29/2011 01:56:19 Shelia: Luv yall too!!!!
The State noted that this text was sent immediately after appellant called Bowers' mother and spoke with her for over one minute. The State stressed that appellant did not first "call his wife, his own mother, or anyone else" after the offense, instead he called "Mama Shelia." The State then suggested that appellant was reporting to her: "mission accomplished." Appellant then immediately texted Bowers' nickname to Rickey:
3/29/2011 01:57:27 Appellant: T buck5
The State argued that this translated to: "We did it for T-bucks."
On the night after the murders, and in the days following, appellant texted with his uncle, Darryl Haynes, who lived in Killeen. The State suggested that these texts show that appellant was in hiding and was trying to secure a new weapon and conceal the murder weapons:
3/30/2011 00:51:09 Appellant: 5ay unk let me hold dat .40[11] 3/30/2011 17:31:44 Haynes: Where are u and u need to give me
[Editor's Note: The preceding image contains the reference for footnote[11] ]
*848 those toys[12] so i can take them to goodwill feel me. 3/30/2011 17:39:20 Appellant: U movin 2 5low on top of dat out of thur 3/30/2011 17:42:19 Haynes: Im here whats up 3/30/2011 17:46:08 Appellant: 5hyd i need a tool[13] but im in mckgregor at rickhard[14] 5hyt 3/30/2011 18:00:27 Haynes: Watch news 3/30/2011 18:01:08 Appellant: Yea we watckhin 3/30/2011 18:07:21 Haynes: I luv u no matter what. 3/30/2011 18:10:16 Appellant: Luv u 2 unk and let me see dat .40 I feel ckrazy witout a 5trap[15] 3/30/2011 23:16:22 Appellant: Wat5 dat 5uppo5e 2 mean and u wron9 the5e bitckh a55 nigga5 ckalled aunt 5heila and 5aid da whole fam got a hit out on u5 and i need dat .40 im naked out hur 3/30/2011 23:24:06 Haynes: I was in tha car when pastor told freddy on tha phone he was on his way home and on that other issue i got u, you need to let me take them other toys. 3/30/2011 23:25:13 Haynes: Let me take them other toys to tha
[Editor's Note: The preceding image contains the references for footnotes[12] ,[13] ,[14] ,[15] ]
*849 k.[16] 3/30/2011 23:26:54 Appellant: 5hyd unk dem hoe5 dwn da hi9hway i told u we had 2 get rid of them but they 5till in arm reackh we ju5 got 2 go dwn da hi9hway 2 get em 3/30/2011 23:27:43 Appellant: U got 2 go 2 da ckountry 2 get dem hoe5
[Editor's Note: The preceding image contains the references for footnotes[16] ]
The State argued that these last two texts meant, "Take the guns out-took the guns out to the country, but they are always in arms' reach if I need them. If I need to take somebody else out, I can get to them." Haynes then followed up the next day:
3/31/2011 09:08:48 Haynes: Getting ready to go back to tha k to pic up that package 4 you, but i want to take those toys back with me. 3/31/2011 09:16:04 Haynes: I know nephew i just want to get them completely away from here 4ever and i know how tel richard to call me from his phone.
Appellant texted with Takelia, who testified that she communicated via text using the signature "**B3T MOD3**." The State represented that these texts show that appellant was hiding out and attempting to obtain new weapons after the offense. The State implied that appellant was referring to Rickey and/or D'Arvis when appellant texted "we":
3/30/2011 02:16:03 Appellant: He kno where it5 at and tell u da truth 5somebody 5aid they 5een u5 and da law5[17] ckam like 2 min after we left 5o i really dnt want 2 move rite nw
[Editor's Note: The preceding image contains the reference for footnote[17] ]
*850 3/30/2011 02:18:39 Takelia: Man damn just say u dnt want to come and what u mean laws **B3T MOD3** 3/30/2011 02:21:39 Appellant: I dnt kno people 5ay we gt 5omethin 2 do wit dat 5hyt wit lokey[18] nem and wen we got 5poted they ckalled da law5 5o 5hut up and ckum get me plea5e 3/30/2011 02:23:02 Takelia: On what car **B3T MOD3** 3/30/2011 02:24:27 Appellant: Were yo ckar 3/30/2011 02:25:29 Takelia: Am talkin about laws on what car **B3T MOD3** 3/30/2011 02:27:50 Appellant: D and rick ckar me and rick went 2 gt hi5 ckar and idk y people throwen r name in it they ckrazy 3/30/2011 02:29:05 Takelia: So were u at **B3T MOD3** 3/30/2011 02:30:05 Appellant: Rick 3/30/2011 16:06:02 Takelia: What u mean if u move u saying u not goin be wth me and yeah it will be ducked off[19] just fam and yo friends will no if u tell them **B3T MOD3** 3/30/2011 16:07:16 Takelia: U dnt thick its ducked off were am from **B3T MOD3**
[Editor's Note: The preceding image contains the references for footnotes[18] ,[19] ]
*851 3/30/2011 16:08:07 Appellant: It depend5 were u talkin bout 3/30/2011 16:09:22 Takelia: Out there by bucc[20] sumwere we gone fine sumwere togther if that okay with albert **B3T MOD3** 3/30/2011 16:26:09 Takelia: U go to sleep when i let u lol but i always look out for u cause i love u **B3T MOD3** 3/30/2011 16:27:25 Appellant: I luv u 2 baby i need a 5trap 2 5o ju5 remember dat 3/30/2011 16:29:01 Takelia: Boy boo ik that and what i need tell me that **B3T MOD3** 3/30/2011 16:31:00 Appellant: Im talken bout a 5 a p like in da next few day5 or even nw[21] 3/30/2011 16:34:12 Takelia: Well get buccs cause my money ant comin to next week or tell bucc u will buy his **B3T MOD3** 3/30/2011 16:44:55 Appellant: Man bukk want let me get hi5 3/30/2011 16:51:44 Takelia: Am call him and see if he can give u the hand gun and when i get that money u can go get yo on **B3T MOD3** 3/30/2011 16:52:55 Appellant: Bet 3/30/2011 17:23:57 Takelia: When u comin back **B3T MOD3**
[Editor's Note: The preceding image contains the references for footnotes[20] ,[21] ]
*852 3/30/2011 17:45:01 Appellant: Damn baby im tryna 5tay out da way i aint got no 5trap y ckant u under5tand dat baby and i ju5 got 5um info 5ayin i 5tay at villa vicktoria[22] 3/30/2011 21:58:45 Takelia: On the way to buccs **B3T MOD3** 3/30/2011 22:01:55 Appellant: Yeah i mi9ht need both da pi5tol and da yhoppa[23] aunt 5heila got a ckall and they 5ay da whole fam wa5 ckonneckted 2 da murda and we gt a hit out on u5 3/30/2011 22:15:11 Appellant: Wat5 9ood wat he 5ay 3/30/2011 22:18:28 Takelia: Getin it **B3T MOD3** 3/30/2011 22:18:51 Appellant: Both of them 3/30/2011 23:27:46 Takelia: Man who u on the phone with **B3T MOD3** 3/30/2011 23:28:41 Appellant: My unkle he tryna get me anotha 5trap 3/30/2011 23:29:16 Takelia: K what he talkin bout **B3T MOD3** 3/30/2011 23:31:32 Appellant: Tryna get di5 glock .40 4 me but 4real baby i need both of buck gun5 5hyt mi9ht 9et out of hand and it mi9ht not 3/30/2011 23:34:16 Takelia: Man albert baby bucc dnt got both
[Editor's Note: The preceding image contains the references for footnotes[22] ,[23] ]
*853 guns and look what happen when i went to get the lil one am doin all i can do for u **B3T MOD3** 3/31/2011 00:28:26 Appellant: Man im mad at the5e hoe a55 nigga5 and ready 2 kill
The State argued that this message in particular showed that just three days after the murders, appellant was in hiding but, "ready to kill again." Later that morning, appellant continued to urge Takelia to help him obtain a gun:
3/31/2011 08:56:38 Appellant: Babi im at rick hou5e and ckan u go get dat 5trap 4 me b4 u ckum 3/31/2011 08:58:56 Takelia: When bucc get back hm **B3T MOD3**
In addition, appellant texted with a phone number registered to D'Arvis. The State suggested these messages showed that appellant was in hiding with Rickey:
3/30/2011 18:53:24 Appellant: U 9ood lil bro 3/30/2011 19:04:52 Appellant: Dat5 a bet well me and bro out here at rickhard 5hyt u 5trapped 3/30/2011 19:05:22 D'Arvis: Not yet 3/30/2011 19:07:17 Appellant: Dat5 a bet bro dnt do 2 muckh movin around b 5afe and luv u bro
Appellant also exchanged texts with an unidentified person whose phone number ended in 7118. This person referred to Bowers by his nickname, "Man-Man":
3/30/2011 19:06:18 7118 to all my real niggas r i p man man 500 Carver[24] 3/30/2011 19:09:06 Appellant: I hear u 9an9sta and we ridin wit my ni99a til da end and neva gne end ya di99 3/30/2011 19:17:15 Appellant: Say bro u b ea5y and keep ya eye5 and ear5 open 4 u5 bro! Nw let me get back 2 relaxin im feelin pre5idental in di5 man5ion me and bro lol bark at me
[Editor's Note: The preceding image contains the reference for footnote[24] ]
By April 2, Rickey had been arrested for the murders of Hubert and Sneed. Appellant *854 continued exchanging text messages with the same person whose phone number ended in 7118. These messages imply that appellant did not believe anyone witnessed him committing the crime:
4/2/2011 10:07:54 Appellant: I heard marion biblc5 5aid rick ckha5ed him in da breeze way u kno wat it i5 God5 9ood homie 4/2/2011 10:09:38 7118 I heard that too. Where that nigga at? And Tyresse name in that shit bro. 500 Carver 4/2/2011 10:14:23 Appellant: I kno bro di5 5hyt ckrazy bro people lien but bro 9ood God5 9ood homie 4/2/2011 10:15:41 Appellant: Idk[25] bro we need 2 find him God5 9ood homie 4/2/2011 10:16:09 7118 Yeah i already know. Rick gone be out 90 days watch. 500 Carver 4/2/2011 10:21:10 Appellant: I kno bro 5olid a55 a rock god got em bro we good aint nobody 5ee 5hyt aint no way nobody 5een dat only god kno wat happened God5 9ood homie
[Editor's Note: The preceding image contains the reference for footnote[25] ]
Less than two days after the murders, appellant texted with an unidentified person at a number ending in 2729, possibly appellant's sister, referring to the "real shooter" and "Man-Man":
3/30/2011 19:23:32 Appellant: di5 Albert 5i5i da real 5hotta5![26] (9an9sta5) u hur mc. Wat5 9ood 3/30/2011 19:32:55 2729 Nothin mucKh family 3/30/2011 19:33:08 2729 what it B like? 3/30/2011 19:38:13 Appellant: 5hyd u kno we poppin dem p5 and b5 up and dem c5 dwn 5tayin ri9hteou5 2 da 9ame and hollerin fuck u pu55y a55 ni99a5 and bitckhe5 eat my dick and rip man man
[Editor's Note: The preceding image contains the reference for footnote[26] ]
Later that evening, appellant texted with an unidentified person at a number ending *855 in 5455, apparently alluding to the fact that appellant committed the crime to avenge Bowers' death and how Bowers would be proud of him:
3/30/2011 23:41:30 5455 Make 5ho u era5c d5 me59age5 3/30/2011 23:41:59 Appellant: I kno 3/30/2011 23:43:34 Appellant: Hell naw i did it ugly and me55y man man had a bla5t wen he 5een dat lol
The State suggested that this last message showed that appellant had "pride in being a killer." The State also stressed that appellant thought he could erase text messages. However, LeCesne testified that, even if a message was deleted off the phone, it would remain on the Metro PCS server for 60 days.
After Rickey's arrest, appellant also texted with his sister, Shae Love. The State argued that the messages showed that appellant asked Shae to provide him with an alibi for the night of the murders:
4/2/2011 15:09:06 Appellant: Im 5ayin 5ay u 5tay wit me in villa victoria ckuz dat wat it 5ay on my probation paper5 i ckant b around takelia 4/2/2011 15:11:42 Shae: Okayy -liv.love.laugh...ily s.jae&&quawn-:) 4/2/2011 15:13:02 Appellant: Dat ni9ht 5ay u wa5nt hm wen i left dat ni9ht but u wa5 aT hm wen i ckame
In sum, our review of the improperly admitted text messages shows that the text messages suggested that: the murders were committed to avenge Bowers' death; appellant was involved in the offense with Rickey and D'Arvis; he believed Bowers would have been proud of them; he concealed the murder weapons; he was hiding in McGregor; he attempted to obtain new weapons after the offense; he asked his sister to provide an alibi; and he was proud of what he had done.
The State presented also the following independent evidence of appellant's guilt:
• Appellant was close friends with Bowers, a.k.a. T-Bucks or Man-Man, who was murdered on April 8, 2010.
• Appellant was also close friends with Rickey and D'Arvis Cummings and the Bowers family.
• Rickey was actively questioning people about who killed Bowers and readily confronted them if he suspected their involvement in the killing. Rickey was armed and usually accompanied by D'Arvis and his other brother, Tyrece, during these confrontations. Appellant was tentatively identified as being present at one of these confrontations. However, witness testimony shows that most people merely assumed appellant was involved because he frequently associated with Rickey.
• The Bowers family felt Hubert was the prime suspect in Bowers' April 2010 murder, and they hounded the *856 police department about its failure to arrest Hubert.
• Cell tower records placed appellant at or near the Lakewood Villas Apartments near the time of the murders on March 28, 2011. This date closely approached the one-year anniversary of Bowers' death.
• Call logs showed that appellant called Rickey 20 minutes before the instant murders. Witness testimony also indicated that when Rickey received a phone call at that time, he immediately left the apartment of the people he was visiting at the Lakewood Villas Apartments.
• Witnesses saw Rickey at the Lakewood Villas Apartments with a heavy-set man carrying a long gun. Immediately after the murders, another witness saw men running through the apartment complex, including a "heavy set" man with a long gun. There was testimony that appellant was "heavy-set" at the time of the instant murders.
• An eyewitness placed Rickey at the scene of the instant murders, stating that she had confronted him while he was chasing Majors and Bible with a .45-caliber weapon.
• Shortly after the murders of Hubert and Sneed, appellant and Rickey went into Brittany Snell's apartment at the Lakewood Villas Apartments so Rickey could borrow her phone. Rickey washed his hands while he was there. The State argued that the evidence showed that appellant washed his hands as well, but Snell testified that appellant never left the kitchen table while he was in her apartment.
• The first phone call appellant made after the murders was to Bowers' mother, Shelia.
• At 3:30 a.m. on the morning after the murders, right after appellant told Takelia that his phone was about to die, Takelia texted Rickey and asked him to tell appellant that she loved him. Takelia must therefore have believed that Rickey was with appellant or in close contact with him.
• At 11:00 a.m. on the morning after the murders, Rickey contacted Takelia requesting that she remove bullets from "the house." She replied that she had already done so. The State insinuated that appellant was the one actually texting Takelia with Rickey's phone. Takelia neither confirmed nor denied this assertion.
• Takelia testified said that her friends, Joy'e and Vinny, were mad and looking for appellant because Marion Bible was in the car with Hubert and Sneed when they were shot and killed.
• Shortly after the offense, Takelia used a cell phone belonging to her sister, Sheronica Patterson, to text appellant about Joy'e and Vinny coming to her apartment. Takelia told appellant that Joy'e and Vinny expressed their anger because Bible was in the car when the shooting occurred. Takelia said that Joy'e and Vinny "told everbody" that she bought appellant a gun and "what kind." Takelia and appellant also discussed the fact that appellant was in hiding and was curious about what was on the news.[27]
*857 • Takelia attempted to purchase an AK-47 a couple of weeks before the instant crime in what appeared to be a "straw purchase" for appellant.
• Appellant had a tattoo resembling Bowers with "R.I.P. Man-Man" appearing underneath next to a tattoo of an AK-47. The State argued that these tattoos were a confession by appellant that he avenged Bowers' death using an AK-47.
While this independent, circumstantial evidence suggests that appellant was involved in the crime, the strongest evidence of his guilt came from the improperly admitted text messages. Further, the State relied heavily on these text messages to prove its case.
In its opening statement, the State emphasized that the text messages would show appellant's involvement in the murders. The State further argued that the texts would establish appellant's incriminating behavior after the murders, which included: hiding in McGregor; trying to acquire new weapons; discussing the disposal of the murder weapons; and instructing his sister to provide him with an alibi. The State said that appellant's guilt "will be shown to you through his own words and his own phone records." The State spent considerable time detailing specific text messages, interpreting them, and pointing out how they proved appellant's guilt. The State argued that the strongest evidence of appellant's guilt came from appellant's "confession" via his text messages.
During closing arguments, the State again stressed the importance of appellant's text messages to prove his guilt:
Now, you have to look at what this man did after the crime. There is such a thing as consciousness of guilt. There is such a thing as statements made and actions taken that show the mindset of a guilty man. Let's look at those things very briefly. I don't know how else you could possibly look at these text messages and phone calls.
* * *
This is the exchange between the defendant and Uncle Darryl Haynes where they are desperately conversing about getting those weapons out of Waco to Killeen. And I ask you again, simply put, is that the conversation between an innocent man and his uncle about Barbie dolls and toys?
* * *
Those are not the words of an innocent man. They are the words of a man, again, a cold-blooded killer, who is attempting on March 30th and 31st to cover his tracks and get those weapons out of Waco, and his uncle desperately wants to take them to Killeen to cover for his nephew.
If ever you saw a confession in a capital murder case written in ink, you're looking at it right here when he says, "Hell, naw, I did it ugly and messy. Man-Man had a blast when he seen dat. Laugh out loud."[28] You know what he's *858 referring to. You've seen the deaths of Tyus Sneed and Keenan Hubert.
* * *
He thought that message would be deleted forever and be hidden from your view forever, but it wasn't, because this server, the Metro PCS, retained his confession for all to see, for you to see and for you to take into account.
* * *
Yes, we spent four days setting up a basis for this case, four days building a foundation to build this man's guilt on. In the last three days, the tower has been built, mostly by Mr. Love's own statements. Folks, I'll ask you, you've got a book. Each and every one of you has every statement this man made by text message. Go back and look at them.
After a review of the record as a whole, we find that the probable impact of the improperly-admitted text messages was great. As we cannot determine beyond a reasonable doubt that the text messages did not contribute to the jury's verdict at the guilt phase, we hold that the error was not harmless. TEX. R. APP. P. 44.2(a).
The judgment of the trial court is reversed, and the cause is remanded for a new trial.
Keller, P.J., filed a dissenting opinion in which Hervey, J., joined.
Meyers, J., dissented.
Keller, P.J., filed a dissenting opinion in which Hervey, J., joined.
The Court grants relief on the ground that obtaining text messages from appellant's cell phone records without a warrant violated the Fourth Amendment. The Court's opinion points to three places in the record where appellant lodged a complaint that had something to do with the Fourth Amendment: (1) a general pretrial motion to suppress, (2) a motion to suppress evidence that was obtained through appellant's cell phone records ("cell phone" motion to suppress), and (3) an objection in a hearing outside the presence of the jury. As we shall see, none of these complaints sufficiently preserved error with respect to the issue on which the Court grants relief.
A. A Complaint Must Be Sufficiently Specific
It is not necessary to employ "specific words or technical considerations" to preserve error.[1] But Rule 33.1 does require that the party's complaint at trial "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."[2] This means that the party must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him."[3] A "general or imprecise objection" will not preserve error "unless the legal basis for the objection is obvious to the court and to opposing counsel."[4] Moreover, when part of the proffered evidence is admissible and part of it is inadmissible, the complaining party must point to the specific portions that he thinks should be excluded.[5]
*859 B. None of the Complaints at Trial Were Sufficiently Specific
1. The General Motion to Suppress
Appellant's general motion to suppress requested the suppression of "all evidence obtained by any officer or other person in violation of any provisions of the Constitution or laws of the State of Texas or the Constitution of the laws of the United States of America, specifically, but not limited to, the following ...." What followed this general statement were three categories: (1) oral or written statements obtained from appellant in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments, counterpart provisions of the Texas Constitution, and Article 38.22 of the Code of Criminal Procedure ; (2) property or other items of physical evidence obtained from appellant's "person, residence, automobile, or place of business" in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments, counterpart provisions of the Texas Constitution, and Article 18.01 of the Texas Code of Criminal Procedure ; and (3) "[a]ny and all other materials or physical items obtained in violation of the Constitution or laws of the State of Texas or of the United States of America."
The general request for suppression and the third category did not place the trial court on notice of anything; no particular evidence was specified nor was any specific constitutional provision cited. The first category recited the Fifth and Sixth Amendments but did not recite the Fourth Amendment and seems to be aimed at confessions made by the defendant to law enforcement officers rather than to text messages made to friends and acquaintances. The second category appears to cover only tangible evidence. The general motion to suppress was not specific enough to raise a Fourth Amendment claim with respect to electronic data associated with cell phones.
2. The Motion to Suppress Evidence Obtained Through Cell Phone Records
At the beginning of his Motion to Suppress Evidence Obtained Through Cell Phone Records and Memorandum in Support, appellant requested the suppression of "any and all evidence the State obtained through use of the Defendant's cell phone records because such evidence was wrongfully derived from an unreasonable search and seizure." In the body of his motion, appellant discussed the Supreme Court case of United States v. Jones ,[6] which, in appellant's words, "held that attachment of a GPS device to a vehicle, and its use of the device to monitor the vehicle constituted a search under the Fourth Amendment." After quoting from the Court's opinion and the concurring opinions in Jones , appellant concluded his motion with the following statement:
Simply put, based upon the United States Supreme Court's recent holding in Jones , it is evident that the State's use of the defendant's cell phone records to obtain information regarding his location or lack of location constitutes an unreasonable search and seizure. As such, any and all evidence derived from said search must be suppressed.
Appellant's "cell phone" motion to suppress sufficiently preserved a Fourth Amendment claim regarding the use of cell phone records containing location data. The motion specifically cited Jones , a GPS case, as authority for holding that the use of cell phone records to obtain location data constituted a search. But the motion *860 did not suggest that it was intended to encompass the use of cell phone records for purposes other than obtaining location data. Having explicitly summed up by saying that obtaining location information was an unreasonable search, the motion simply failed to convey the idea that text messages should also be suppressed.
3. Trial Objection
The discussion at trial regarding the admissibility of cell phone records begins on page 11 of volume 36 of the court reporter's record and continues for ten pages. On pages 11 and 12, defense counsel objected generally to evidence obtained from the cell phone records of appellant, Rickey Cummings, D'Arvis Cummings, Sheronica Patterson, Shelia Bowers, Shacira Love, and Brittany Snell. Defense counsel objected that text messages within these records were inadmissible on the basis of relevance, hearsay, and character. On pages 12 through 19, the prosecutor summarized the contents of the cell phone records of each person and explained their relevance. When asked for a response, defense counsel stated:
[T]hose records include text messages to people other than Albert Love [appellant]. That constitutes hearsay. If there were any messages between that particular phone and those phones and Mr. Love, they would certainly be contained within Mr. Love's records, so I think those are somewhat redundant and aren't necessary, and certainly anything above and beyond those records would be hearsay.[7]
After a response from the prosecutor, the trial court then said, "All right. Anything else Mr. Evans [defense counsel]?" Defense counsel responded that the cell phone records for Sheronica Patterson were not needed if she could testify. Defense counsel then objected to "these records" under Texas Rule of Evidence 403. After that, defense counsel stated, on page 21:
Further, Your Honor, with regard to these matters and in light of the current state of affairs in our nation, we would argue that these records, without a search warrant, should not have been accessible, and since they were not [sic] produced without a search warrant, Judge, we would argue they should be inadmissible as well.[8]
After that objection, defense counsel stated that some messages in appellant's records (Exhibit 185) that were made by Sheronica Patterson were redundant and would constitute hearsay, but the prosecutor explained that there were no text messages of that sort and defense counsel said, "Never mind."
The trial court then overruled the objections. Then the prosecutor said:
Could I also have the record reflect that these records were not obtained with a search warrant, but they were obtained by Court orders, I believe, in many instances signed by this particular Court for the records in question. I would like the record to reflect that, Your Honor.
The trial court then stated, "So noted. The objections are overruled on all grounds."
I think it is probably correct to construe defense counsel's statement about the absence of a search warrant "in light of the current state of affairs in our nation" as a *861 Fourth Amendment complaint. Nevertheless, I think the objection was insufficiently specific for two reasons.
First, the objection appeared as a perfunctory afterthought, with no explanation as to why there was a Fourth Amendment violation; so, the trial court could have thought that the objection was simply a reference to the "cell phone" motion to suppress, which contested only the use of location data. The entire pages-long discussion that preceded the complaint never once mentioned "search warrant," and the claim was not made until the trial court indicated, by asking whether there was anything else, that it was ready to wrap up the hearing. If appellant intended to make a new claim, I do not believe that he put the court on notice that he was doing so. And as far as I can tell, the prosecutor may also have thought the Fourth Amendment objection still referred to the subject of the "cell phone" motion. Appellant's Fourth Amendment objection at trial was not sufficiently specific to place the trial court on notice that he was contesting the admissibility of the text messages contained in his cell phone records.[9]
Second, even if this vaguely-worded Fourth Amendment objection were construed to be a new claim, separate from the "cell phone" motion, and to embrace all data contained in the cell phone records that were being discussed, most of that data was admissible. As the Court explains, the cell phone location data was not the result of a search, and appellant had no standing to challenge the cell phone records of other people. But defense counsel's Fourth Amendment challenge was to all of these records as a unit. He made no attempt to segregate the records that were subject to his Fourth Amendment challenge from those that were not. Nor did he attempt to obtain a more specific ruling with respect to the different types of cell-phone-record evidence. Whether the entries in the records involved location data or text messages, or whether the records were appellant's records or the records of another, defense counsel made (at best) but a single global objection to them all. Under these circumstances, defense counsel's single global objection failed to preserve the claim upon which the Court grants relief.[10]
With these comments, I respectfully dissent.

Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

Although the Court would prefer the parties to specifically number their points of error, appellant did not. In the point of error that appears sixth in his brief, he argues, among other things, that the trial court erred to admit the content of his text messages because they were obtained without a warrant in violation of the Fourth Amendment.

To the extent that he also argues that his rights were violated by the introduction of the phone records of his associates Sheronica Patterson, Shelia Bowers, Shacira Love, and Brittany Snell (State's Exhibits 186 through 189, and 252) because they were not procured by warrants, appellant has no standing because he has no colorable privacy interest in their records. Rakas v. Illinois , 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed"). We further note that because there is no evidence in the appellate record as to how his associates' phone records were obtained, and because he makes no statutory complaint about the admission of these records on appeal, we offer no opinion as to whether or not they were legally obtained.

The dissenting opinion acknowledges that Appellant sufficiently specified the legal grounds for his objection-that a lack of a warrant made the State's acquisition of the cell phone records objectionable under the Fourth Amendment. Dissenting Opinion at 6. Nevertheless, the dissenting opinion takes the position that Appellant's objection was insufficiently specific with respect to what he was objecting to because it failed to segregate those portions of the cell phone records that required a warrant from those that did not. Id. at 6-7. We think it may safely be assumed that it was Appellant's position that the cell phone records in their entirety were subject to the Fourth Amendment warrant requirement. After all, this case was tried well before this Court's opinion in Ford v. State , 477 S.W.3d 321 (Tex. Crim. App. 2015), in which we first held that short-term historical cell-site-location information could be obtained without a warrant. It is true that we have sometimes said that, in order to preserve error with respect to a voluminous exhibit, only parts of which are objectionable, an appellant must specify to the trial court those parts to which he is specifically objecting. See George E. Dix & John M. Schmolesky, 43A Texas Practice: Criminal Practice and Procedure § 53:74, at 1049 (3d ed. 2011) ("If a unit of evidence-such as an exhibit-contains both admissible and inadmissible parts, an objection to the inadmissible portion must specifically refer to that part or portion of the evidence.") (citing Sonnier v. State , 913 S.W.2d 511, 518 (Tex. Crim. App. 1995) ). Here, by contrast, it is obvious from Appellant's objection that he believed the entirety of the cell phone records (including the records of his text messages) were objectionable-and for the same specific reason, namely, the absence of a warrant as ordinarily required by the Fourth Amendment. It is now apparent, after Ford , that part of those records are not subject to the warrant requirement. But that should not deprive Appellant of his ability to complain on appeal of the admission of those parts which-as we hold today-are subject to the Fourth Amendment warrant requirement.
Moreover, Appellant's objection was specific enough. In the bench conference that preceded the trial court's ruling on the admissibility of the cell phone records, the parties made numerous allusions to the text messages that were contained within those records, including the text messages originating from Appellant's phone. Therefore, notwithstanding Appellant's earlier motions to suppress, it would have been readily apparent to the trial court at trial that the scope of Appellant's Fourth Amendment objection had expanded to include objections to the admissibility of text messages, including his own. Once Appellant pointed out that the cell phone records were obtained without a warrant, it was the State's obligation to establish that the State's acquisition was nonetheless "reasonable" for Fourth Amendment purposes. E.g. , State v. Betts , 397 S.W.3d 198, 207 (Tex. Crim. App. 2013). It was not up to Appellant to identify which of the portions of the records were obtained unreasonably; they were all presumptively obtained unreasonably because they were all obtained in the absence of a warrant. Rather, it was the State's burden to establish which portions may have been obtained reasonably even though obtained without a warrant.

The order in question was also not contained in the initial appellate record. This Court consequently ordered a supplementation of the record and obtained a copy of the court order. Love v. State , No. AP-77,024 (Tex. Crim. App. Feb. 3, 2016) (not designated for publication).

The order provides that the production of appellant's cell phone records is also authorized pursuant to Article 18.21, § 2(b), and 18 U.S.C. §§ 3117 and 3122. However, these statutory provisions pertain to the placement of physical tracing equipment or the use of a pen register, and are thus inapplicable to the instant case.

During his testimony regarding the storage of text messages, LeCesne merely stated that the text messages were not transmitted by the cell towers. Instead, the text messages were sent directly to the Metro PCS servers, where they would be deleted after 60 days due to lack of storage space. Unlike in his testimony regarding CSLI data, LeCesne did not state a business purpose for storing text messages.

Appellant also argues that, in obtaining the court order, the State did not even satisfy the dictates of the Stored Communications Act and our state law analog, Article 18.21. He argues that his text messages should have been suppressed for this reason as well. We note that both the federal and state statutes upon which Appellant relies expressly rule out the suppression of evidence as an available remedy-unless that statutory violation also "infringes on a right of a party guaranteed by a state or federal constitution." Article 18.21, §§ 12 & 13. Before we may invoke the general exclusionary remedy embodied in Article 38.23, therefore, we must identify (as we have) a constitutional violation.

Appellant and Takelia were not married until after appellant was arrested for the instant crime. However, for ease of reference, we will refer to her as appellant's wife because they were married at the time of appellant's trial.

During his testimony, LeCesne stated that appellant used "5" in place of "s," "9" in place of "g," "3" in place of "e," "y" in place of "i," and "ck" in place of "c" on most occasions. He also agreed with the State that "5hyd" and "5hyt" both mean "shit."

LeCesne testified that ".40" generally refers to the caliber of a weapon.

LeCesne testified that "toys" is slang for "guns."

LeCesne testified that "tool" is slang for "gun."

Takelia testified that Richard Thomas is her cousin who lives in McGregor, Texas.

LeCesne testified that "strap" or "strapped" is slang for "firearm" or "to be armed."

The prosecutor asserted that "k" is slang for "Killeen."

LeCesne testified that "law5" usually means "the police."

Waco Police Officer Michael Alston testified that Keenan Hubert's nickname was "Lockie."

Takelia testified that "ducked off" is slang for "hiding."

Takelia testified that "bucc" is a nickname for her brother, Ricky Patterson.

Takelia testified that this meant that appellant "needed a gun right now."

Appellant had apparently been living at the Villa Victoria apartments before the murders.

LeCesne testified that "yhoppa" or "choppa" is slang for "AK-47."

"500 Carver" appears to be the signature for the person using the 7118 number.

LeCesne testified that "idk" usually means "I don't know."

The State suggested to the jury that "5hotta5" meant "shooters."

There were 48 text messages, obtained from the cell phone company records pertaining to Patterson's phone, contained in State's Exhibits 186 and 187. Appellant has no standing to complain about the admission of State's Exhibits 186 and 187 on Fourth Amendment grounds because he had no privacy interest in Patterson's cell phone records. See Rakas v. Illinois , 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed"); Granville , 423 S.W.3d at 406. Appellant makes no statutory claim regarding the method by which Patterson's records were obtained. Therefore, we do not consider whether the trial court erred in admitting these records.

The actual text that the State was translating read as follows: "Hell naw i did it ugly and me55y man man had a bla5t wen he 5een dat lol."

Vasquez v. State , 483 S.W.3d 550, 554 (Tex. Crim. App. 2016).

Tex. R. App. P. 33.1(a)(1)(A).

Vasquez , 483 S.W.3d at 554.

Id. (emphasis in original).

Whitaker v. State , 286 S.W.3d 355, 369 (Tex. Crim. App. 2009).

565 U.S. 400 (2012).

These statements might have been a tacit admission that text messages from appellant contained in his own records would not be hearsay under the party opponent rule. See Tex. R. Evid . 801(e)(2).

The "[sic]" notation appears in court reporter's record.

The Court contends that it would have been readily apparent to the trial court after appellant's ten pages of objections having nothing to do with the Fourth Amendment that references to text messages within those objections meant that his Fourth Amendment objection had been expanded to include text messages. But, the brevity and vagueness of appellant's Fourth Amendment objection, the existence of a prior motion to suppress that was limited to location data, and the brevity with which the parties and the trial court treated the objection suggests otherwise.

This was the State's argument for why error was not preserved. The Court's answer is essentially that, because Ford v. State , 477 S.W.3d 321 (Tex. Crim. App. 2015), had not yet been decided, defense counsel had no reason to know that location data would ultimately be found to be admissible, and so, we should excuse his failure to distinguish between location data and text messages. But that argument, even if accepted, would not excuse the failure of the objection to distinguish between appellant's cell phone records and the cell phone records of other people. The proposition that a defendant cannot, under the Fourth Amendment, contest the violation of someone else's expectation of privacy is well established. Rakas v. Illinois , 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).