**REVERSE and REMAND; Opinion Filed December 15, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-15-00818-CR**

**CHRISTOPHER JAMES HOLDER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80782-2013**

## MEMORANDUM OPINION

Before Justices Myers, Whitehill, and Nowell
Opinion by Justice Myers

A jury convicted appellant Christopher James Holder of capital murder and he appealed the judgment and sentence. He brought thirteen issues challenging the sufficiency of the evidence; the trial court's denial of appellant's motion to suppress his cell phone records; the alleged denial of the right to confrontation; the admission of expert opinion; the trial court's overruling of appellant's objection that the State asked a witness a question that assumed facts not in evidence; the trial court's denial of appellant's motion to suppress his statement to the police; the denial of an accomplice witness jury instruction; and cumulative error. On original submission we affirmed the judgment of conviction. *See Holder v. State*, No. 05-15-00818-CR,

2016 WL 4421362 (Tex. App.—Dallas Aug. 19, 2016). The Texas Court of Criminal Appeals granted review. While the case was pending, the United States Supreme Court decided *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206 (2018), holding that persons have a reasonable expectation of privacy under the Fourth Amendment in cell site location information and, therefore, a search warrant is required to obtain seven or more days of that information. *Id.* at 2217. The Court of Criminal Appeals reversed this Court, concluding appellant had a reasonable expectation of privacy under Article I, Section 9 of the Texas Constitution in the twenty-three days of his cell cite location information accessed by the State.[1] The case was remanded for us to determine whether appellant was harmed by the erroneous admission of the cell cite location information. *See Holder v. State*, 595 S.W.3d 691, 704 (Tex. Crim. App. 2020). Having considered this question, we reverse and remand the judgment of conviction.

## DISCUSSION

The sole issue before us is whether appellant was harmed by the erroneous admission of his cell site location information, but the parties disagree on what standard of harm we should apply.[2] Appellant contends the constitutional harm standard of rule 44.2(a) applies in this case, but that even under the less rigorous

---

[1] The State conceded that the petition seeking appellant's cell site location information did not set forth sufficient facts to establish probable cause, *id.* at 704 n.27, and the State did not claim exigent circumstances or some other recognized law enforcement need. *Id.*

[2] Because the facts of this case were thoroughly discussed in our previous opinion, we recount them here as necessary to address the question of harm.

harm analysis of rule 44.2(b), the harm is evident. *See* TEX. R. APP. P. 44.2(a), (b). The State maintains the error in question is harmless under the rule 44.2(b) non-constitutional harm standard. *See id*. 44.2(b). Accordingly, we turn first to the question of whether we should review for harm under 44.2(a) or 44.2(b).

In *Love v. State*, 543 S.W.3d 835 (Tex. Crim. App. 2016), which concerned improperly admitted text messages and which, like the present case, dealt with Article I, section 9 of the Texas Constitution, the court held that the text messages should have been suppressed under article 38.23(a) of the Texas Code of Criminal Procedure. *Id.* at 845–46. The court then analyzed the error in question, which it termed constitutional in nature, using the constitutional harm standard of rule 44.2(a). *Id*. at 846; *see also Speers v. State*, No. 05-14-00179-CR, 2016 WL 929223, at *9 (Tex. App.—Dallas Mar. 10, 2016, no pet.) (mem. op., not designated for publication) ("A constitutional error within the meaning of Texas Rule of Appellate Procedure 44.2(a) is an error that directly offends the United States Constitution or the Texas Constitution, without regard to any statute or rule that also might apply."). The court in *Love* ultimately concluded the error was not harmless because it could not determine beyond a reasonable doubt that the text messages did not contribute to the jury's verdict at the guilt-innocence phase. *Love*, 543 S.W.3d at 858.

Over three years later, in *Dixon v. State*, which concerned cell site location information, the majority concluded the court of appeals erred in its harm analysis and that even assuming the admission of the evidence was error under the Fourth

Amendment, it was clearly harmless, and the admission of the evidence was harmless beyond a reasonable doubt. *See Dixon v. State*, 595 S.W.3d 216, 218–20 (Tex. Crim. App. 2020). In a concurring opinion, however, Judge Hervey, joined by two other judges, opined that while the court "analyzed the statutory error in *Love* for constitutional harm, we were wrong to do so and should disavow that part of the Court's opinion." *Id.* at 226 (Hervey, J., concurring). The concurring opinion further stated:

> We use a constitutional-harm standard to determine whether a Fourth Amendment violation is harmful because the federal exclusionary [rule] is constitutional in nature, inherent in the Fourth Amendment. *Hernandez v. State*, 60 S.W.3d 106 (Tex. Crim. App. 2001); *see* Tex. R. App. [P.] 44.2(a). Unlike the Fourth Amendment, however, we have held that there is no suppression remedy inherent in Article I, Section 9. *Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998) (citing *Welchek v. State*, 93 Tex. Crim. 271, 247 S.W. 524 (1922)). Instead, the remedy for an Article I, Section 9 violation is to invoke one of Texas's statutory exclusionary rules.
>
> That brings me to the problem with *Love*. Violations of statutes are reviewed for non-constitutional harm, not constitutional harm. Thus, we erred [in *Love*] when we analyzed the statutory error in that case for constitutional harm. Consequently, we should overrule that part of our opinion at our earliest opportunity. Erroneously assessing harm under the much higher constitutional-harm standard unfairly punishes the State.

*Id.* (footnotes omitted).

The State similarly points out that the Texas Constitution does not require the exclusion of evidence obtained in violation of article I, section 9, and that article 38.23(a), the Texas exclusionary rule that most suppression claims rely on, is statutory in nature. *See Miles v. State*, 241 S.W.3d 28, 33 (Tex. Crim. App. 2007)

–4–

(Texas Legislature enacted the Texas exclusionary rule in 1925 in response to *Welchek v. State*, 93 Tex. Crim. 271, 247 S.W. 524 (Tex. Crim. App. 1922), where the Court of Criminal Appeals found no explicit or implicit exclusionary rule in the Texas Constitution); *Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998) ("Article I, Section 9 creates no exclusionary rule similar to that found in Fourth Amendment for federal prosecutions.") (citing *Welchek*). Furthermore, argues the State, the fact that article 38.23 implements the constitutional right to be free of unreasonable searches does not alter this analysis. *See Gray v. State*, 159 S.W.3d 95, 97 (Tex. Crim. App. 2005) ("[M]any—perhaps most—statutes are designed to help ensure the protection of one constitutional right or another. Having such a purpose does not convert a statutory right into one of federal constitutional dimension, much less a right whose violation is considered to be structural error.").

Thus, according to the State, the non-constitutional harm standard of 44.2(b) applies because the error in question is statutory "under a plain reading of [rule] 44.2." The State acknowledges that *Love* "may implicitly suggest a contrary result," but it suggests that "it does not appear that the Court in *Love* considered the above analysis," and, "[a]t any rate, the analysis advanced above has been expressly discussed and adopted by at least four members of that court." *See Dixon*, 595 S.W.3d at 225 (Hervey, J., concurring); *Hernandez v. State*, 60 S.W.3d 106, 116 (Tex. Crim. App. 2001) (Keller, P.J., dissenting) (stating that "Article 38.23 is a statutory mechanism, not a constitutional one, and any error predicated thereon must

be analyzed under the standard of harm for non-constitutional errors.").

As an intermediate appellate court, however, we are required to follow existing precedent, and this of course includes decisions of the Court of Criminal Appeals. Absent a contrary decision from a higher court or an intervening and relevant change in applicable statutory law, we are bound by that precedent. *See, e.g., Merrit v. State*, 529 S.W.3d 549, 554 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("As an intermediate appellate court, we lack the authority to overrule an opinion of the Court of Criminal Appeals."); *see also Cervantes-Guervara v. State*, 532 S.W.3d 827, 832 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Sherman v. State*, 12 S.W.3d 489, 494 (Tex. App.—Dallas 1999, no pet.). Moreover, concurring opinions have only persuasive value; they are not binding precedent. *See, e.g., Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013) (noting that concurring opinions have only persuasive value); *Schultz v. State*, 923 S.W.2d 1, 3 n.2 (Tex. Crim. App. 1996) ("As a concurring opinion, *Lugo-Lugo* [650 S.W.2d 72, 87 (Tex. Crim. App. 1983) (Clinton, J. concurring)] is not binding precedent."). As the Fort Worth Court of Appeals recently stated:

> Appellant's arguments implicate the violation of a statute—Article 38.23 of the Code of Criminal Procedure; thus, we would normally be inclined to utilize the standard of Rule 44.2(b). But a recent opinion from the Court of Criminal Appeals includes a concurrence that noted that the court's prior precedent appears to require the more strenuous constitutional harm analysis when addressing the failure to exclude evidence under Article 38.23. *See Dixon v. State*, 595 S.W.3d 216, 225–26 (Tex. Crim. App. 2020) (Hervey, J., concurring) (citing *Love v. State*, 543 S.W.3d 835, 845 (Tex. Crim. App. 2016)). Though the

concurrence urges the Court of Criminal Appeals to overrule the precedent that analyzed a violation of a statute for constitutional harm, we follow the state of the law as we understand it to be and analyze Appellant's claim based on the alleged violation of Article 38.23 for constitutional harm.

*Livingston v. State*, No. 02-19-00288-CR, 2020 WL 6165411, at *9 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication).

We reach a similar conclusion. The Court of Criminal Appeals has held that the acquisition of appellant's cell site location information without probable cause violated privacy protections guaranteed by Article 1, section 9 of the Texas Constitution. And the most recent binding legal authority of which we are aware tells us that our analysis for harm in a situation like this must follow the constitutional harm standard of rule 44.2(a). We now turn to that question.

Under rule 44.2(a), if an error is constitutional in nature, an appellate court must reverse the judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). In applying this "harmless error" test, we inquire whether there is a reasonable possibility the error might have contributed to the conviction or punishment. *Love*, 543 S.W.3d at 846 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

Our harm analysis should focus as much as possible on the probable effect the evidence had on the jury in light of the existence of other evidence. *Id.* (citing *Wesbrook v. State*, 29 S.W.3d at 119). "We consider such things as the nature of the

error, the extent to which it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error." *Id.* (citing *Snowden v. State*, 353 S.W.3d 815, 821–22 (Tex. Crim. App. 2011)). This list is not exclusive, and the court should review any and every circumstance apparent in the record that logically informs a determination of whether, beyond a reasonable doubt, the particular error contributed to the conviction or punishment. *Id.* (citing *Snowden*, 353 S.W.3d at 822). We are required to evaluate the entire record in a neutral manner "and not 'in the light most favorable to the prosecution.'" *Id.* (quoting *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (discussing constitutional harm under former TEX. R. APP. P. 81(b)(2))).

Applying these principles, the nature of the constitutional error in this case was the erroneous admission of evidence—appellant's cell site location information. As the Court of Criminal Appeals stated in its opinion, and as we recounted in our previous opinion, call log records showed that the victim in this case, Billy Tanner, "was alive until at least 2:35 p.m. on November 10 [2012] because that is when he ended a phone call with his parents." *Holder*, 595 S.W.3d at 697. "After this call ended, Tanner's phone did not connect to another tower until it was recovered by police." *Id.* at n.10. Furthermore,

> The [call log] records also showed that, between 3:28 p.m. and 4:16 p.m. the same day, Appellant's cell phone connected to the tower that "best served" Tanner's home. (According to the State, this is when Tanner was killed.) By 4:16 p.m., Appellant's cell phone had left the area, but it reentered the area at 12:41 a.m. on November 11.

–8–

> Appellant's phone was pinging in Tanner's coverage area until 12:44 a.m. From 12:44 a.m. to 2:11 a.m., there was no activity on Appellant's phone. At 2:11 a.m., the phone pinged a tower near the parking garage where police found Tanner's abandoned truck.

*Id.*

There was no forensic evidence from the crime scene—no DNA, blood, fingerprints, or shoe prints—directly connecting appellant to Tanner's murder. However, the State used the cell site location data from appellant's phone to show his phone was "hitting off" of the cellular tower that "best served" Tanner's home on Saturday, November 10, 2012, between 3:28 to 4:16 p.m. This was when the State believed Tanner was murdered (he died from blunt force trauma to the head and multiple stab wounds).

The State also used the cell site data from appellant's phone to show his statements to the police regarding his whereabouts on the afternoon of Saturday, November 10 were inconsistent with his cellular records. For example, appellant gave detectives a timeline of where he had been on November 10, telling them he went to the Irving tattoo shop where he worked, took his girlfriend Vanessa Garcia to work in Irving, went to a birthday party, and then picked Vanessa up from work and went back to her house, where he stayed with her. The following day he went to the movies. The detectives told appellant they had his cellular records, and that this timeline was inconsistent with what those records showed. Appellant eventually told them he had been in the Plano area near Jupiter and Highway 190 trying to buy

drugs from a person named "Chris." However, that area was several miles from the crime scene, the two areas were served by different cellular towers, and the cellular records showed appellant's phone was "hitting off" of the cellular tower nearest Tanner's house on Saturday, November 10. Appellant denied being at Tanner's house on November 10, and he said the last time he had been there was when Tanner asked him to move out. Appellant also said he had never driven Tanner's truck.

In addition, the State used the cell site data from appellant's phone to corroborate the testimony of Thomas Uselton, who provided substantial evidence against appellant. Uselton testified that he and appellant visited Tanner's house after the murder and cleaned up the crime scene, among other things. As the Court of Criminal Appeals summarized:

> In January [of 2013], a Tarrant County fire investigator told Plano detectives that an inmate named Thomas Uselton (Uselton) had information about the murder. Uselton told the detectives that he had known Appellant for a few years and that Appellant called him on November 10 around 2:00 p.m. or 3:00 p.m. because he wanted to buy drugs. According to Uselton, Appellant sounded "real hysterical, like real hyper." Uselton said that Appellant called him back later that day and asked him to help with "something" and that he agreed. Appellant rode with his ex-girlfriend to Fort Worth to pick up Uselton. After they picked him up, she drove them to Appellant's tattoo parlor, where Appellant picked up some bleach and black latex gloves, then to Tanner's house. According to Uselton, when they entered Tanner's house, Appellant hugged him and told him that "[h]e's dead. We ain't got to worry about it." Uselton asked who was dead, but then he saw Tanner's body around the corner. Appellant said, "[T]hink about [y]our family, bro. You know what it is if you say anything." Uselton asked what Tanner did, and Appellant responded that "He molested a little girl." Uselton understood Appellant's comment as an admission that he killed Tanner. Uselton said that Appellant's ex-girlfriend picked

them up at the parking garage in Irving where police found Tanner's abandoned truck. While Appellant and Uselton waited, Uselton "spray[ed] everything down with bleach." When Appellant's ex-girlfriend arrived, they went back to Appellant's tattoo shop. Uselton went to a nearby convenience store to buy some cigarettes and a drink. When he returned, he overheard Appellant's ex-girlfriend ask Appellant in another room, "Why did you do it?" He replied that he "had to."

Uselton also told police other details about the crime that were not public. For example, he told police that Appellant unplugged the garage-door opener at Tanner's house, that he helped Appellant cover up windows and the sliding glass door with blankets, and that he helped Appellant pour gas around the house.

*Id*. at 607–98. Although appellant states in his supplemental brief that Uselton was an accomplice, we noted in our previous opinion that the jury charge did not include an accomplice-witness instruction, and we rejected appellant's argument that Uselton was an accomplice as a matter of law. *See Holder*, 2016 WL 4421362, at **23–24.

The evidence further showed that, while they were at the crime scene, appellant suggested to Uselton they "make it look like a robbery." Uselton retrieved a laptop and some other items, and appellant grabbed Tanner's wallet from a dresser drawer. Appellant said, "Let me cut his head off, make sure he's dead," and Uselton replied, "No, dude, I think he's dead, bro. Leave it alone." They walked over to Tanner's body and appellant, holding a butcher knife, leaned over Tanner and stabbed him in the neck with the knife. Later, after they got to the tattoo parlor, Uselton went into the restroom and when he came out, he saw appellant standing in the dark crying.

–11–

Plano police found a pair of black latex gloves at the crime scene, on Tanner's kitchen table. During their investigation, Plano detectives learned that appellant was a tattoo artist, and they found a Facebook photo of appellant tattooing someone while wearing a pair of black latex gloves like the ones found in the house. The gloves from the crime scene were submitted for DNA testing, and the DNA analysis determined appellant could not be excluded as a major contributor of the mixed DNA swabs collected from the gloves. The forensic DNA analyst concluded it would be extremely unlikely that anyone other than appellant would be the major contributor of the DNA from the glove swabs.

Before detectives spoke with Uselton, they were aware that Tanner's truck had been stolen and had located it in a Las Colinas parking garage with the help of the Irving Police Department. When the police took Uselton out of jail a few months later to confirm his story by identifying relevant locations, Uselton directed them to the same parking garage in Las Colinas, and he directed them to Tanner's house.

Vanessa Garcia corroborated some of Uselton's testimony. She testified that she and appellant picked up Uselton on the night of Saturday November 10; they drove to a residential neighborhood in Plano; appellant and Uselton got out of the car and she went home; and early the following morning she picked up appellant and Uselton near a parking garage in Las Colinas.

Appellant argues the cell site location data from his phone was the foundation on which the State's case was built, showing his identity as the person responsible

for Tanner's death. The State responds that the cell site location information was merely one part of a multi-faceted case, and that when appellant's cell site location data is viewed in the context of the State's entire case, it "would not have substantially swayed the jury." "Instead," argues the State, that evidence "would have simply incrementally improved the jury's reason to believe the State's other evidence." Yet the record shows that the State developed and relied heavily on appellant's cell site location data to prove its case, arguing the cellular records showed appellant's phone was in the area of the crime scene during the time when the State maintained Tanner was murdered, and that appellant lied regarding his whereabouts on Saturday, November 10. As the State told jurors in its opening statement:

> And Plano P.D., when they got these court ordered cellphone records, they determined that the cell tower next to Bill Tanner's house, that the defendant's phone had hit off of that cellphone tower around 3:10, the closest cellphone tower to Bill's house, around 3:10 that Saturday. And, of course, Bill Tanner's last phone call, the last anyone heard from him or saw him, was at 1:45 Saturday. So the police know that the defendant's cellphone was hitting off the tower next to Bill Tanner's house.

> Then they go talk to the defendant. They talk to him, and they want to get his side of the story. And they ask him, "Where were you on Saturday?" And he gives sort of a spiel about what he was doing. The one thing that he says was that he was not in Plano, because he lived down in Irving. That's where he's from. That's where the tattoo shop was, wasn't anywhere near Plano. So they know, well, your cellphone was. So they ask him, "Did you have your cellphone with you? Maybe somebody else was using it. Maybe somebody borrowed it." Yes, his cellphone was always with him. Next they ask what his number was to confirm. They confirm they have the right phone. They have the right

–13–

phone number. So they know that doesn't make sense.

So once he says this story, they confront him with it, say, well, what you're telling us doesn't make a lot of sense, because your cellphone was in Plano. He doesn't have a real good explanation, because he's lying. You can see that.

Then the detective plants a suggestion. Well, could it be because maybe you were using methamphetamine, and you were in Plano at the time buying methamphetamine? Ah, yes. Ah, yes. So then he says, yes, I was in Plano, and I was looking to score. However, when asked what part of Plano, he puts himself south, around 190 and Jupiter, which is going to be closer to the Richardson/Plano border than where Mr. Tanner's home was, which is closer to Spring Creek and Parker in east Plano. And you will hear that there's cellphone towers around 190 that are different than the cellphone towers that would hit if they were closer to Bill Tanner's house. And the police officers know that it's still not right. So now they know that the defendant had his phone. They know that his phone is hitting off the cell tower closest to Bill Tanner's house, and Bill—we didn't hear from him after that Saturday around 1:45.

The State continued to emphasize these issues in its closing argument:

Coincidentally, 43 minutes after Bill Tanner makes his last phone call, the defendant shows up near the crime scene. And no, the phone records, they don't say, hey, this person is at a particular address. But what they do tell you, and in this specific instance, they tell you that he's hitting off a very specific tower, and a specific side of that tower, the side of that tower that serves the crime scene's address. The most likely tower and side of tower to serve that address, the best server, as the AT&T engineer, K.D. Burdett testified, that's the server that's going to serve that address. That's the tower that's going to serve it. And remember, you know there's several addresses, there's several places where, you know, we can be multiple towers in a lot of these addresses, or multiple sides of the towers, but not 3121 Royal Oaks [Tanner's Plano, Texas address]. It's this one tower, tower 2397/1151, that one side of the tower.

And that directly discredits the defendant's statements to the police. What did he tell the police? He tells them, I wasn't in Plano. I wasn't in Plano at all. I was in Irving. I was either at Vanessa Garcia's house or at the tattoo shop. I took Vanessa Garcia to work in Lewisville. I

went to a birthday party in Irving, pretty much in Irving and picking her up in Lewisville. That's it. What did we do that night? We stayed— just hung out, stayed at her house. We didn't really go anywhere. Gas is expensive. That's what he tells the police. Forgets to mention Plano altogether. Why is that?

And yet these show that he, in fact, was in Plano. When the police confront him with that evidence, say, hey, we've got your phone records, we know you were in Plano, can you tell us why, give us something, we're trying to figure things out because you're not being honest with us, initially he can't think of anything. "I don't know. I wasn't in Plano." He maintains that.

And then eventually he comes up with a different story. Well, you know, I did go to Plano. I did go to Plano, and it was to buy drugs, and it was from this guy, and I went over in the Jupiter/190 area, Jupiter/George Bush area. That's where this guy lives. And I bought some drugs. I didn't want to get him in trouble. Okay?

Looking at this map, you can tell Jupiter/190 area, where it is. It's nowhere near where the crime scene is, nowhere near where the crime scene tower is. So that story just didn't fly. It doesn't check out. It doesn't match with the evidence. But that's the defendant's story, because he's got to come up with something.

What else do the phone records show you? Well, they show you that that night the defendant travels to Fort Worth, again contrary to his story of, "We stayed at home," travels to Fort Worth, and he picks up Thomas Uselton, something that again corroborates Thomas Uselton's story, something that corroborates Vanessa Garcia's story. "Yeah, we went to Fort Worth." Defendant conveniently leaves that out when he's talking to the police. And again, we can see exactly the phone tower that he hits off of when he gets to Fort Worth, and it's the one that services that Kroger where Thomas Uselton says he was waiting off of Camp Bowie.

What happens after that? Well, he travels back to Irving. Thomas Uselton says, "Hey, we went to Irving, we stopped off at the tattoo shop, he got some cleaning supplies, got some gloves." All consistent with the evidence and consistent with the phone records, as he pings off a tower, the tower that serves—one of the towers that serves the tattoo shop at 11:49 p.m.

And then on to the crime scene, from 12:41 to 12:44 a.m. Now, you don't have a lot of activity on the phone at this time, because it goes off after 12:44 a.m. There's no activity. Nothing is registering on a tower. Again, consistent with the phone being turned off.

Later, toward the end of its closing argument, the State told jurors their task was akin to assembling the pieces of a puzzle:

As the State, we have to prove the case to you beyond a reasonable doubt. It's not beyond all doubt. It's not beyond a shadow of a doubt. It's beyond a reasonable doubt. And in this particular case, and it's like [the State] pointed out to you in jury selection, we have those pieces of the puzzle, those different pieces of evidence. When you look at them, and you analyze them alone, they're insignificant. They mean something. It could be a number of different things. But when you start putting the pieces together, adding them up, they start to show you something. They start to give you a clearer picture. And you may not have the full picture. There's going to be holes. We talked about that. We discussed that. But when you look at all the evidence together, it becomes clearer what happened in this case. It becomes clearer that the defendant murdered Bill Tanner.

The State's puzzle analogy illustrates that there was other evidence of guilt in this case apart from the cell site location data, such as Uselton's testimony and the evidence corroborating it. It is also true, as the State points out in its supplemental brief, that "'[a] defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to prove that he committed the offense.'" *Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)); *see also Eadha v. State*, No. 05-17-01296-CR, 2019 WL 3423278, at *3 (Tex. App.—Dallas July 30, 2019, no pet.) (not designated for publication). Likewise, concealing incriminating evidence is probative of wrongful conduct and

–16–

a circumstance of guilt. *See Guevara v. State*, 152 S.W.3d 45, 49–50 (Tex. Crim. App. 2004); *see also Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). But to say that appellant's cell site location information only *incrementally* improved the jury's reason to believe the State's other evidence goes a bridge too far. Uselton's testimony, for example, certainly suggests appellant was involved in the crime; however, appellant's cell site location information was a crucial part—if not *the* crucial part—of the State's case. This evidence showed appellant was in the area of the crime scene during the time when Tanner was supposed to have been murdered, and that appellant lied regarding his whereabouts on that day. Without appellant's cell site location information, in other words, a major piece of the puzzle is missing. Therefore, after reviewing the record as a whole, we conclude the probable impact of the improperly admitted cell site location information was great. And because we cannot determine beyond a reasonable doubt that the cell site location information did not contribute to the jury's verdict, the error was not harmless. *See* TEX. R. APP. P. 44.2(a).

Accordingly, we reverse the judgment of conviction and remand this case for further proceedings.

/Lana Myers
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).
150818RF.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

CHRISTOPHER JAMES HOLDER,
Appellant

No. 05-15-00818-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 416-80782-2013.
Opinion delivered by Justice Myers.
Justices Whitehill and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered this 15th day of December, 2020.