**Affirmed and Opinion Filed August 23, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-15-00818-CR**

**CHRISTOPHER JAMES HOLDER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80782-2013**

# MEMORANDUM OPINION

Before Justices Myers, Nowell, and Garcia
Opinion by Justice Myers

A jury convicted appellant Christopher James Holder of capital murder and

he appealed the judgment and life sentence. He brought thirteen issues challenging

the sufficiency of the evidence; the trial court's denial of appellant's motion to

suppress his cell phone records; the alleged denial of the right to confrontation; the

admission of expert opinion; the trial court's overruling of appellant's objection that

the State asked a witness a question that assumed facts not in evidence; the trial

court's denial of appellant's motion to suppress his statement to the police; the denial

of an accomplice witness jury instruction; and cumulative error. On original

submission we affirmed the judgment of conviction.  *See Holder v. State*, No. 05-15-00818-CR, 2016 WL 4421362 (Tex. App.—Dallas Aug. 19, 2016) (*Holder I*), *rev'd*, 595 S.W.3d 691 (Tex. Crim. App. 2020) (*Holder II*).

The Texas Court of Criminal Appeals granted review.  While the case was pending, the United States Supreme Court decided *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206 (2018), holding that persons have a reasonable expectation of privacy under the Fourth Amendment in at least seven days of cell site location information (CSLI) records even though they are third-party business records.  *Id*. at 2217.  Adopting the Supreme Court's reasoning in *Carpenter*, the Court of Criminal Appeals reversed this Court, concluding appellant had a reasonable expectation of privacy under Article I, Section 9 of the Texas Constitution in the twenty-three days of his CSLI accessed by the State.  *See Holder II*, 595 S.W.3d at 704.[1]  The case was remanded for us to determine whether appellant was harmed by the erroneous admission of the CSLI records.  *See id.*

Based on the Court of Criminal Appeals' decision in *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016), we conducted the harm analysis on remand under rule 44.2(a) of the Texas Rules of Appellate Procedure.  *See Holder v. State*, No. 05-15-00818-CR, 2020 WL 7350627, at *2–3 (Tex. App.—Dallas Dec. 15, 2020) (*Holder III*), *vacated*, 639 S.W.3d 704 (Tex. Crim. App. 2022) (*Holder*

---

[1] The court's opinion noted that the State conceded the petition seeking appellant's CSLI did not support a finding of probable cause.  *Id.* at 704 & n.27.

*IV*). Under that standard of harm, we reversed appellant's conviction and remanded the case for further proceedings. *Holder III*, 2020 WL 7350627, at *7–8.

The Court of Criminal Appeals once again granted review, concluding it was mistaken in *Love* in applying, in that case, the rule 44.2(a) constitutional-error harm analysis. *See Holder IV*, 639 S.W.3d at 707. The court noted that Judges Hervey and Keller had suggested elsewhere that when the only basis for the exclusion of evidence was our statutory exclusionary rule, the correct standard for determining harm was rule 44.2(b). *Id.* The court disavowed *Love* to the extent it deemed subsection 44.2(a), rather than (b), to be the appropriate harm analysis when, as here, only a violation of article 38.23 is involved. *Id.* The court vacated our opinion and remanded the case to us to conduct a harm analysis under rule 44.2(b). *Id.* at 708. Having now done so, we affirm the judgment of conviction.

## DISCUSSION

In our prior opinion on remand,[2] we concluded that because we could not "determine beyond a reasonable doubt that the [CSLI] did not contribute to the jury's verdict, the error was not harmless." *Holder II*, 2020 WL 7350627, at *7. In reaching this conclusion, however, we were applying "the more rigorous constitutional-error harm analysis" of rule 44.2(a). *See Bell v. State*, 415 S.W.3d 278, 284 (Tex. Crim. App. 2013); *see also Long v. State*, 203 S.W.3d 352, 353 (Tex.

---

[2] Because the facts of this case have been recounted in our previous opinions, we discuss them here only as necessary to address the question of harm.

–3–

Crim. App. 2006) (rule 44.2(a) "is a stricter standard" than 44.2(b)).  As the Court of Criminal Appeals has noted, "constitutional and non-constitutional errors are subject to vastly different analyses on appeal."  *Clark v. State*, 365 S.W.3d 333, 338 (Tex. Crim. App. 2012).  A constitutional error requires us to reverse a judgment *unless* we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment.  *Id.*

Rule 44.2(b), on the other hand, which we now apply, provides that "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  TEX. R. APP. P. 44.2(b).  Therefore, we disregard any non-constitutional error that does not affect a defendant's "substantial rights."  TEX. R. APP. P. 44.2(b); *Delgado v. State*, 635 S.W.3d 730, 754 (Tex. App.—Dallas 2021, pet. ref'd).  A substantial right is affected if an error has a substantial and injurious effect or influence in determining the jury's verdict.  *Delgado*, 635 S.W.3d at 754 (citing *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016)); *see also Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014).  An error had a substantial and injurious effect or influence if it substantially swayed the jury's judgment.  *Thomas*, 505 S.W.3d at 926.  "The proper inquiry is 'whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.'"  *Id.* (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946)).  "On the other hand, if 'the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.'"  *Id.* (quoting *Kotteakos*, 328 U.S. at 764).

–4–

Reviewing the record, there is evidence apart from the CSLI showing appellant had both motive and opportunity to commit the charged offense. *E.g.*, *Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt. Opportunity, when coupled with motive, is not sufficient to prove identity in a murder prosecution but is indicative of guilt.") (footnotes omitted); *Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) ("[A]lthough motive is not an element of murder, it may be a circumstance that is indicative of guilt.") (footnotes omitted). For example, the decedent/complainant, Billy Tanner, asked appellant to move out of his home after appellant's relationship with Tanner's stepdaughter, Casey James, had deteriorated. The evidence also showed appellant was aware, before the murder, of allegations made by Casey's five-year-old daughter, C.J., against Tanner (e.g., C.J. wanted to move out of Tanner's house because he was "nasty" and slept without underwear). Casey called appellant for advice because he had been around C.J. and Tanner at times when she had not, and she wanted to know if Tanner had done anything that could have offended C.J. or made her feel uncomfortable. Appellant responded, "110 percent," but he also said it had always happened when Casey was in the room. Casey asked a best friend for advice, and the friend spoke to C.J. after school, later reporting that she believed

nothing had happened.[3] Based on this conversation, Casey concluded nothing had occurred, and she called appellant and gave him the news. Appellant later expressed strong feelings to lead detective Elizabeth Spillman that children should not be molested.

Casey was supposed to be out of town during the weekend of Friday, November 9, 2012, visiting a former boyfriend in prison in Plainview, Texas. She had told appellant, Tanner, and her mother that she was going to a family reunion. In addition, detectives knew from interviewing witnesses that Tanner was, as Detective Spillman recalled, "pretty much a heavy drinker." On weekends, he tended to drink beer in the mornings and pass out in the afternoons. Appellant acknowledged being aware of Tanner's drinking habits.

Thomas Uselton, who was not an accomplice witness,[4] provided especially graphic and detailed testimony regarding his experiences with appellant inside Tanner's house, and he also provided an eyewitness account of appellant's incriminating conduct after the offense. *E.g., Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful

---

[3] A Child Protective Services investigator interviewed C.J. in December 2012 and determined that the child had not suffered any sexual abuse.

[4] As we noted in both our prior opinions, the jury charge here did not include an accomplice witness instruction and Uselton was not an accomplice as a matter of law. *See Holder III*, 2020 WL 7350627, at *5; *Holder I*, 2016 WL 4421362, at *23–24.

conduct and are also circumstances of guilt."); *see also Nisbett*, 552 S.W.3d at 267.

Uselton testified that he had called appellant at around 2:00 or 3:00 p.m. on Saturday, November 10, 2012, because he wanted drugs. Appellant sounded "real hysterical" when Uselton spoke to him. Appellant promised to call him back. Later that day, as it was getting dark outside, appellant called him back and asked if he wanted to help him with something. Uselton said, "Okay, I'll help you with it," and appellant picked him up at a Kroger grocery store located near Camp Bowie in west Fort Worth. When appellant met Uselton at the agreed location, his new girlfriend, Vanessa Garcia, and her son were with appellant in the car, a white Mustang. Appellant was wearing a black sweater. Uselton got in the car and asked, "What are we doing?" Appellant said, "I'll show you when we get there." Appellant and Uselton smoked "dope" as they drove to the Images-N-Ink tattoo shop in Irving, where they went inside to appellant's booth and got some gloves and bleach. Uselton again asked, "What are we doing?" Appellant replied, "I'll tell you when we get there."

They got back in the car and drove to Plano. When they reached some railroad tracks, appellant told Uselton to "text this phone number" and "[t]ell him I'm almost to the house," and that "[i[f he wants to look at the bike, come on." At that point, Uselton thought they "were stealing a bike or something." Uselton texted the message as instructed. He noticed that appellant was putting on gloves, so Uselton did the same. They drove to a residential area Uselton did not recognize. When they

reached a cul-de-sac, appellant and Uselton got out of the car, and Garcia drove away. They approached a house Uselton soon recognized because he had been there before. Appellant went in first, followed by Uselton. Appellant told Uselton to shut and lock the door. Appellant walked toward the master bedroom, came back, hugged Uselton, and then said, "He's dead. We ain't got to worry about it." Uselton asked, "Who is dead?" He walked around the corner and saw Tanner's body. Blood was all over the walls. Appellant said, "Look, think about your family, bro. You know what it is if you say anything." *E.g.*, *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (threats against a witness evidences a consciousness of guilt). Uselton asked, "What did he do?" Appellant replied, "He molested a little girl." Uselton said, "Well, the piece of shit deserved it then," and they walked into the garage and started smoking "dope." Uselton said that Tanner's daughter could come home at any minute, and they should at least "lock the garage door or something." Appellant unplugged the garage door opener.

Appellant asked Uselton to help him cover up the windows. They nailed a blanket over the kitchen window and took another blanket and threw it over the rear sliding glass door. Appellant told Uselton to go and shut the bedroom window, and as he walked past Tanner's body Uselton recalled that it frightened him: Tanner's eyes were swollen shut and there was a gash on his forehead. He was pale white and "stiff looking."

Appellant suggested they make it look like a robbery. He mopped the kitchen

floor, and they poured ammonia in the garage and around where they had been standing. Uselton retrieved the laptop and some other items, and appellant grabbed Tanner's wallet from a dresser drawer. Appellant said, "Let me cut his head off, make sure he's dead," and Uselton replied, "No, dude, I think he's dead, bro. Leave it alone." They walked over to the body. Appellant was holding a butcher knife. Appellant looked at Uselton, looked back at the body, and then he leaned over and stabbed the body in the neck with the knife. When appellant pulled out the knife, there was no blood on it.

Appellant had asked Uselton to help him move the body, and Uselton suggested they just "burn the house or something." Appellant got a can of gasoline from the garage and told Uselton to "pour it everywhere." Uselton poured the gas "everywhere." Appellant "lit the fire" and they "barely made it out the door." Uselton turned around after he closed the door behind him; he could see the flames. As they drove away in Tanner's pickup truck, Uselton tossed the laptop out the window. After calling Vanessa Garcia and telling her to pick them up in Las Colinas, appellant parked the truck in a parking garage. Uselton wiped everything in the truck down with bleach, and they disposed of the butcher knife in a shed on the top floor of the garage. As Garcia drove them to the tattoo shop, Uselton said that he needed to get rid of his "shoes and shit" because he did not want to get caught, and appellant replied, "I know, I know."

When they got to the tattoo shop, Uselton went into the restroom, and when

he came out, he found appellant standing in the dark crying. Uselton asked appellant if he was okay, and appellant said, "Yeah, I'll be okay." Appellant gave Uselton some money and went over to talk to Garcia, telling Uselton to go to a nearby convenience store and buy cigarettes. When Uselton returned from the convenience store, he could hear appellant and Garcia talking in the next room. He testified as follows:

> I went, got a pack of a Marlboro reds and a Dr. Pepper, come back in the tattoo shop, and him and Vanessa are talking about something in another room, and I'm sitting there. I'm sitting in this chair smoking, and I hear through the wall she's like, "Why did you do it?" He's like, "I had to." And then we went to leave and she like didn't want to leave because she went back in another booth where he was, and I went outside. I had a trash bag. I was waiting for him because there was a door. I was looking to go out. He was like, "You want to fucking leave." He goes in there and I hear a smack, smack, hitting noise, "I want to fucking leave now." She comes out crying, and, well, we go to—go downstairs.

They put "everything" in a trash bag, including gloves, clothes, and Tanner's wallet, and Uselton later threw the trash bag in a dumpster at a supermarket. It was around 4:00 a.m. when Garcia dropped off Uselton at a friend's house in the North Richland Hills area.

As the Court of Criminal Appeals stated in its first opinion, and as we recounted in both our previous opinions, call log records showed that Tanner "was alive until at least 2:35 p.m. on November 10 [2012] because that is when he ended a phone call with his parents." *E.g.*, *Holder II*, 595 S.W.3d at 697. "After this call

–10–

ended, Tanner's phone did not connect to another tower until it was recovered by police." *Id.* at n.10. Furthermore,

> The [call log] records also showed that, between 3:28 p.m. and 4:16 p.m. the same day, Appellant's cell phone connected to the tower that "best served" Tanner's home. (According to the State, this is when Tanner was killed.) By 4:16 p.m., Appellant's cell phone had left the area, but it reentered the area at 12:41 a.m. on November 11. Appellant's phone was pinging in Tanner's coverage area until 12:44 a.m. From 12:44 a.m. to 2:11 a.m., there was no activity on Appellant's phone. At 2:11 a.m., the phone pinged a tower near the parking garage where police found Tanner's abandoned truck.

*Id.* at 697. The State used the CSLI data to show appellant's phone was "hitting off" of the cellular tower that "best served" Tanner's home on Saturday, November 10, 2012, between 3:28 to 4:16 p.m. In addition, the State used the cell site data from appellant's phone to show his statements to the police regarding his whereabouts on November 10 were inconsistent with his cellular records.

The State also used the CSLI data to corroborate Uselton's testimony regarding his movements on Saturday, November 10 from Fort Worth to Tanner's house in Plano, and then to a Las Colinas parking garage. But some of Uselton's testimony was corroborated by other evidence. For example, detectives found a pair of black latex gloves on a kitchen table at the crime scene. There was no blood on the gloves, and Casey said the gloves were not there when she left Tanner's home on Friday November 9th. Detective Spillman found a Facebook photo of appellant, who was a tattoo artist, tattooing while wearing a pair of black latex gloves similar to the ones found in the house. The gloves from the house were submitted for DNA

testing, and DNA analysis determined appellant could not be excluded as a major contributor of the mixed DNA swabs collected from the gloves. The forensic DNA analyst concluded it would be extremely unlikely anyone other than appellant would be the major contributor of the DNA from the glove swabs.

According to the medical examiner, Tanner was beaten and stabbed to death. He had a blunt force injury to the head and twenty stab wounds. There was a stab wound to Tanner's neck that the examiner believed was inflicted post-mortem—supporting Uselton's testimony that he saw appellant stab Tanner in the neck after he was dead.

Before detectives spoke with Uselton, they were aware that Tanner's truck had been stolen and had located it in a Las Colinas parking garage with the help of the Irving Police Department. When the police took Uselton out of jail a few months later to confirm his story by identifying relevant locations, Uselton directed them to the same parking garage in Las Colinas (a key detail of the offense that had not been made public), and he directed them to Tanner's house. The evidence also showed that Uselton told the police other details of the crime that, according to Detective Spillman, no one else would have known unless they were there—e.g., the post-mortem stab wound in the neck; the black gloves.

Vanessa Garcia likewise corroborated some of Uselton's testimony. She testified that she and appellant drove (appellant was driving Garcia's car because he did not have one) to Fort Worth to pick up Uselton on Saturday, November 10; they

drove to a residential neighborhood in Plano, where appellant and Uselton got out of the car; she went home; and early the following morning she picked up appellant and Uselton near a parking garage in Las Colinas and drove them to the tattoo shop.

Garcia also testified that she and appellant smoked methamphetamine together, and appellant was using methamphetamine extensively during the week Tanner was murdered. She noted that she saw appellant high on methamphetamine "a lot." The owner of the tattoo shop where appellant worked likewise testified that appellant appeared to be high on methamphetamine the week of the murder, and that appellant was acting paranoid. Both Garcia and the owner testified that appellant was sleeping some nights at the tattoo shop because he did not have a place to stay. The medical examiner testified that methamphetamine stimulates the central nervous system, can affect a person's judgment, and can have numerous psychic effects. It can also cause a person's reaction times to be quicker, and it can contribute to paranoid thinking and sleep deprivation.

Turning to the jury arguments, we noted in our previous opinion that the State's opening and closing arguments made effective use of the CSLI data. But, as we also observed, it was far from the only evidence on which the State relied. The State began its opening statement by chronologically detailing how the investigation unfolded and how the police started focusing on appellant as the primary suspect. In addition to focusing on the crime scene and the discovery of Tanner's body, the State previewed appellant's motive for committing the offense—e.g., the deteriorating

–13–

relationship between appellant and Casey; appellant getting thrown out of the house; C.J.'s accusations regarding Tanner. The State also focused on opportunity, noting that appellant knew Casey was going to be out of town on the weekend of Friday, November 9, 2012. The State next discussed the CSLI (as we noted in our previous opinion),[5] and then the DNA evidence (the latex gloves found on the kitchen table at the crime scene).

What followed was a detailed preview of what the State expected the jurors to hear from Uselton and Vanessa Garcia, and this is the longest portion of the State's opening statement. In it, the State acknowledged Uselton had "lots of flies [sic], lots of reasons probably not to believe him," but that "Uselton knows things about that scene that no one else could know unless you were a police officer." The State also told the jurors, among other things, that they would hear Uselton testify that when he saw Tanner's body, he asked appellant what he had done, and appellant replied that he killed Tanner "because he's a child molester." In the concluding portion of its opening statement, the State asserted:

> So what you're going to hear is the physical evidence, the DNA, the cellphone towers, that by themselves put the defendant in that crime scene. And then you're going to hear from people who, without a doubt, had flies [sic], and on their own are reason enough not to believe them, but the corroboration of their story with different people, with cellphone tower records, DNA, it will all come together. It may be hard to follow, but this is one of those cases that, as we go through, you're going to have a little piece here, a little piece here, a little piece here,

---

[5] *Holder III*, 2020 WL 7350627, at *6–7.

and it will eventually come together, and you will see the big picture[.]

The State began its closing argument by stressing that Tanner fought for his life, as evidenced by all the blood at the crime scene and the stab wounds on Tanner's body. The State noted that "[t]his wasn't a random act of violence" or "a burglary gone wrong." It then argued:

> It was an act of a man who knew Bill Tanner, a man who was high on meth, a man who was down on his luck, desperate, didn't really have a place to stay at the time, a man who got it in his head, based on a comment, that Bill Tanner had molested a little girl. He had convinced himself that that is what had happened. Remember, 110 percent sure. That is how sure this man was, this man, obviously, being the defendant. Now, there's a lot of evidence, a lot of things that point towards the defendant committing this crime in this case. There's the physical evidence. There's the phone records. And then there's testimony.
>
> Now, you as jurors are the sole judges of the credibility of witnesses. You can believe all, some, or none of what they say. And there's several witnesses that testified in this case, each offering something a little different, another piece of evidence here and there, another thing that points the finger at the defendant, another thing that shows the defendant committed this crime. But perhaps no testimony was more important, no testimony more powerful, than that of Thomas Uselton.

The State highlighted Uselton's testimony, stating that when he testified, "you could hear a pin drop in this courtroom. Every person in here was hanging on every last word that he said. Everyone was listening intently to what he said. . . ." The State continued:

> Now why is that? Is it because, you know, it was kind of—it's a gruesome, twisted story that grabs your attention in somewhat of a sick way? Yes. Those are the things that would make you want to listen to what he has to say. But is that the only reason? Or is it also because what he was telling you was real. What he was telling you was the

–15–

truth. Because I guarantee you, if Thomas Uselton got on the stand and told you a bunch of lies, you would see right through it.

Addressing the question of Uselton's motive to lie, the State noted that he was not given any deal for his testimony and "[h]e hasn't been offered anything." The State also argued that many of the things Uselton said in his testimony were corroborated:

> And think about all the things that he said that are corroborated by the evidence, things that he knew that no one else could know, things he knew about Bill Tanner's body, things he knew about the crime scene, where they traveled. And one of those things that we know to be true are the phone records. Think of how his testimony is corroborated by the phone records.

The State then reviewed the CSLI evidence (as we noted in our previous opinion),[6] arguing it showed appellant was the area of Tanner's house on Saturday, November 10, 2012, during the time when the State believed the murder occurred; discredited appellant's statements to the police; and it corroborated Uselton's testimony regarding his movements that day. Returning to the puzzle analogy it used earlier, the State reminded the jurors:

> As the State, we have to prove the case to you beyond a reasonable doubt. It's not beyond all doubt. It's not beyond a shadow of a doubt. It's beyond a reasonable doubt. And in this particular case, and it's like [the State] pointed out to you in jury selection, we have those pieces of the puzzle, those different pieces of evidence. When you look at them, and you analyze them alone, they're insignificant. They mean something. It could be a number of different things. But when you start putting the pieces together, adding them up, they start to show you something. They start to give you a clearer picture. And you may not have the full picture. There's going to be holes. We talked about that.

---

[6] *Holder III*, 2020 WL 7350627, at *7.

We discussed that. But when you look at all the evidence together, it becomes clearer what happened in this case. It becomes clearer that the defendant murdered Bill Tanner.

Now, the defense wants you to look at those pieces in a vacuum. They want you to analyze each piece by itself and say, well, this mean [sic] a number of different things. But that is not your job. That is not your duty. It is to look at all the evidence together and see how it fits together. And that's what we're going to ask you to do in this case.

The State ended the first part of its closing argument by ruling out other suspects raised by the defense, such as Casey James, Uselton, and Steve James (the brother of Casey's mother, Teresa Heppel). It then underscored appellant's motives to commit the offense and ridiculed the argument that, according to the State's evidence, appellant did nothing more than go to Tanner's house and burglarize it, commit arson, and steal Tanner's truck:

The defendant goes to the house. He sees Bill Tanner's dead body, makes the—Thomas Uselton, "Oh, he's dead." And then decides to, rather than getting out, getting out of the house, getting away, decides, well, let's try to clean up someone else's murder scene. Let's try to destroy someone else's evidence. Let's try to clean that up. Let's try to burn the house down, and let's steal the dead guy's truck. Let's instantly make ourselves suspects in this murder. Does that make one bit of sense? It doesn't. It's ridiculous. It's ludicrous. Because that's not the truth. That's not what is reasonable.

During the final part of its closing argument, after rebutting the defense's theories regarding other suspects, the State again emphasized that this "wasn't a burglary gone wrong," noting that firearms, televisions, and tools that could have been pawned were left behind. The State then turned to appellant's motives and opportunities to kill Tanner, reminding jurors, among other things, that appellant had

been kicked out of the house by Tanner; appellant was aware of C.J.'s allegations regarding Tanner; appellant knew about Tanner's habit of drinking on weekends; appellant knew Tanner would be alone on the weekend of Friday, November 9, 2012. Referring to the CSLI evidence, the State discussed appellant's movements on Saturday November 10th, and the fact that he was near Tanner's house for an hour on Saturday afternoon. It also emphasized appellant's lies to the police and how he changed his story—eventually telling them he had been in the Plano area, where Tanner's home was located, near Jupiter and Highway 190 on that Saturday trying to buy drugs from a person named Chris—only after detectives told appellant they had his cellphone records and that his initial timeline was inconsistent with what those records showed. But appellant's story, the State continued, did not match up with the cellphone records, which showed he was in a different area. The State next argued that appellant convinced Vanessa Garcia to lie for his benefit about the details of that weekend, and then turned again to the defense's argument that appellant's only involvement was entering Tanner's house to clean up the crime scene:

> [T]here's this idea that maybe all the defendant did was just clean the place up, you know, arson or tampering with evidence. But that's really the only evidence here, and we should charge the defendant with that. It's absurd. Why in the heck would you make yourself a suspect to anything? I mean, if you are cleaning up the murder scene, the only person that benefits is the murderer. And the only reason Uselton and Vanessa are even there is because they're lied to about what they're going to do. Uselton thinks—he's not really given a good reason, but he assumes they're going to go steal a bike. You're not going to get two people who have nothing to do with the murder. "Hey, got this crazy bloody murder scene, do you want to come and help me clean it

up?" No. It makes absolutely no sense. It's absurd. But because the case is so strong, you got to come up with stuff, and that's what is coming up. That's not reasonable at all.

The State also discussed how appellant's DNA on the black latex gloves connected appellant to the crime scene—e.g., they appeared after Friday evening when Casey had left for the weekend, and appellant had access to similar gloves at the tattoo shop where he worked. The State then explained why other suspects suggested by the defense, such as Uselton or Steve James, could not have killed Tanner. The State concluded by arguing that appellant "committed the capital murder of Bill Tanner," and that appellant, whether "because of meth, because he's narcissistic, [or] who knows," "decided that he could take it upon himself to be both judge, jury and executioner."

During its deliberations, the jury sent out two notes asking about the specifics of Uselton's testimony, with the first note stating:

In Thomas Uselton's testimony we would like the exact comments he made when he and CJ[7] arrived to the house and recounted for what CJ said to him.

Also[,] Thomas's statement about what he overheard between CJ and Vanessa [Garcia] after they left the crime scene and were at the tat[t]oo shop.

The second note elaborated on the first, explaining in part that the jurors disagreed regarding what, precisely, Uselton heard appellant say when appellant told him, at

---

[7] Although both notes refer to "CJ," not appellant, the context indicates that the jurors were referring to appellant.

the crime scene cleanup, that Tanner was a "child molester."

The State developed and relied on the CSLI evidence throughout the trial. It made effective use of that evidence to argue appellant was in the area of the crime scene during the time when the State believed Tanner was murdered, and that appellant lied regarding his whereabouts that Saturday, November 10, 2012. However, the CSLI data was far from the only evidence on which the State relied to prove its case. Uselton provided graphic and detailed testimony that was not shaken by impeachment or attacks on his credibility, as evidenced by the two jury notes inquiring about the specifics of his testimony. The State also used the CSLI evidence to corroborate Uselton's testimony regarding his movements on November 10, but Garcia also partially corroborated Uselton's testimony on his movements that day. Combined with the State's other non-CSLI corroborating evidence, Uselton's testimony provided strong circumstantial evidence of appellant's guilt. Reviewing the record under rule 44.2(b), we conclude that the erroneous admission of the CSLI evidence did not have a substantial and injurious effect on the jury's verdict, and, therefore, that appellant was not harmed. *See* TEX. R. APP. P. 44.2(b).

We affirm the judgement of conviction.


150818f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)

/Lana Myers//
_____
LANA MYERS
JUSTICE

–20–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHRISTOPHER JAMES HOLDER, Appellant

No. 05-15-00818-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial District Court, Collin County, Texas Trial Court Cause No. 416-80782-2013.
Opinion delivered by Justice Myers. Justices Nowell and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 23rd day of August, 2022.